In re Matthew T. MORAN, Sandra Kim Sweeney Moran, Debtors.

J.C. ARNEY, Plaintiff,

v.

Matthew T. MORAN, Defendant.

In re David M. MANGRUM, Pamela B. Mangrum, Debtors.

J.C. ARNEY, Plaintiff,

v.

David M. MANGRUM, Defendant.

Bankruptcy Nos. 7–89–01164, 7–89–001124.

Adv. Nos. 7–89–0195, 7–89–0196.

United States Bankruptcy Court, W.D. Virginia, Roanoke Division.

Oct. 26, 1990.

---

John S. Edwards, Roanoke, Va., for Plaintiff.

Joseph P. Bounds, Roanoke, Va., for Mangrum.

James Cromwell, Roanoke, Va., for Moran.

## MEMORANDUM OPINION

ROSS W. KRUMM, Bankruptcy Judge.

The matter before the court for decision is the dischargeability of claims made by J.C. Arney against both Matthew T. Moran and David M. Mangrum. The complaints against Mangrum and Moran are identical and were consolidated for trial. They involve multiple counts and allege that discharge should be denied under 11 U.S.C. § 523(a)(2)(A), section 523(a)(4) and section 727(a)(3).

Since some of the transactions involve loans by Arney to Alpha Corporation, the capital stock of which was owned by Arney, Mangrum and Moran, there is an issue of whether the corporate veil should be pierced to permit the assertion of claims against Mangrum and Moran as individuals.

At a consolidated trial held in Roanoke, Virginia, on September 20 and 21, 1990, the court received evidence and made certain findings of fact and rulings of law on the record pursuant to a motion for involuntary dismissal by the defendants under Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41 made at the conclusion of plaintiff's evidence. As a result of these rulings which are incorporated in the order accompanying this memorandum opinion, there remains for decision the following issues: (1) The dischargeability of loans made by Arney to Alpha Corporation in February, March and June of 1988, totaling $70,000.00 in unpaid principal less a $15,-000.00 payment to Arney in December 1988; (2) a loan by Arney to the Alpha Corporation in the amount of $15,000.00 on or about December 31, 1988, in order to permit the corporation to retain legal counsel for representation in a Chapter 11 reorganization proceeding in the Roanoke Division of the bankruptcy court; (3) the curing of defaults in rent arrearage owed by Alpha Corporation to various landlords by a loan from Arney to Alpha Corporation on or about December 31, 1988, in the amount of $29,300.00; (4) the failure of Mangrum and Moran to maintain sufficient corporate records as grounds for denial of discharge of all of their debts in their personal bankruptcy proceedings under 11 U.S.C. § 727(a)(3).

Having heard all of the evidence and arguments of counsel, the court now makes its findings of fact and rulings of law pursuant to Bankruptcy Rule 7052.

### Facts

This case involves three individuals who were stockholders in a Virginia corporation known as Alpha Corporation. Alpha Corporation was formed by Mangrum and Moran to operate a clothing business in Roanoke, Virginia, sometime in 1985. Prior to the defendants' formation of Alpha Corporation, both had been employed at a Wrangler clothing store in Roanoke, Virginia, which they ultimately purchased.

Moran had the most experience in the clothing business at the time of purchase. Mangrum worked part-time in the business until his graduation from high school. Thereafter, he became involved in the clothing industry on a full-time basis.

Mangrum was well acquainted with Arney through Mangrum's friendship with Arney's son. Testimony at trial revealed that Mangrum spent a great deal of time in Arney's home and that they had a close personal relationship. In fact, in 1985, Mangrum borrowed $20,000.00 from Arney on a telephone call in order to permit Mangrum and Moran to purchase the Wrangler store in Roanoke. This loan was repaid to Arney promptly.

While there was a personal relationship between Arney and Mangrum throughout this time period, there does not appear to have been a continuing business relationship between the three individuals until June of 1987, when Mangrum and Moran approached Arney with a proposal for purchase of three clothing stores in Roanoke, Rocky Mount and Blacksburg, Virginia, which traded as F.S. Fitch stores. Arney agreed to buy a forty-nine percent (49%) stock interest in Alpha Corporation and paid $50,000.00 into the corporation for his interest. In addition, he loaned the corporation $10,000.00 for operating capital. Arney also arranged for the necessary term loans to permit the purchase of the three businesses. These term loans were in the amount of $350,000.00 from Colonial American Bank (now Crestar) and $58,000.00 from Salem Bank.

Arney, Mangrum and Moran were also directors for the corporation. Moran served as president and Mangrum served as secretary-treasurer. Arney was not an officer. There was a division of labor among the shareholders. Mangrum and Moran were responsible for the day-to-day business operation. Arney's role was to be that of a financial advisor. He was also the individual to facilitate the obtaining of the necessary credit for the operations of the business on the strength of his personal financial resources. Arney was consulted on all major business decisions. His only knowledge of the day-to-day operations came from Mangrum and Moran.

The business appeared to do well in its inception and through the end of the calendar year 1987. In fact, Arney's $10,000.00 loan to the corporation was repaid in December of 1987.

During this start-up period, however, the business experienced difficulties with the landlords at the three locations in Rocky Mount, Virginia, Blacksburg, Virginia, and, in particular, Tanglewood Square in Roanoke, Virginia. It was also necessary to obtain extensions of credit from Levi Strauss, the main clothing supplier for the F.S. Fitch stores and delays in obtaining the proper credit credentials to obtain goods on credit from Levi Strauss caused delays in arrival of inventory for the Fall and Christmas seasons. The uncontradicted testimony of Arney at trial is that he was unaware of these difficulties during the 1987 start up of Alpha Corporation through December of 1988. Rather, Arney knew that he had been repaid his $10,000.00 loan in December of 1987, and testified that Mangrum and Moran had represented to him during the latter part of 1987 that the business was doing well. This appearance of well being was apparently supported by Arney's knowledge that employees and directors had received a bonus around the Christmas season and that the company had conducted a nice Christmas party for employees.

In February of 1988, Mangrum and Moran approached Arney for a loan of $20,000.00 to the corporation. Arney's testimony is that the loan was to be a "seasonal type" loan to be repaid either from the back to school sales in September of 1988 or the sales generated during the Christmas season. Arney also testified that he made general inquiries about sales and was told that sales were "okay." It was Arney's understanding that the $20,000.00 loan would be used to buy inventory for the company. Plaintiff's exhibit 24 reflects that Arney loaned the corporation $20,000.00 and received a promissory note from it. The only obligor on the note was the corporate entity. Mangrum testified at tri-

al that the February 1988 loan was put into the company's general checking account and was to pay vendor invoices as they became due. Moran confirmed Mangrum's testimony as to the use of the loan proceeds; however, he explained that it was necessary to pay the accounts payable of the corporation in order to obtain additional credit for purchase of inventory and continued operation of the business. As evidenced by plaintiff's exhibit 12, the factor of accounts receivable for Levi Strauss, Elesco, communicated in writing to the corporation in December 1987 concerning a $2,639.19 past due balance on the account, a total balance due of $56,684.98 and a total account balance of $95,902.75 which exceeded the letter of credit given to Levi Strauss to secure the purchase of inventory. Elesco requested payment of the past due balance and the current due balance by December 21, 1987. There is no evidence as to how the letter of Elesco Factors dated December 11, 1987, was resolved by Alpha Corporation. Further, there is no evidence as to the status of the account as of February 10, 1988, the date that Arney made the $20,000.00 loan to the corporation. However, there is evidence that the corporation had a continuing relationship with Levi Strauss until the end of December 1988. In fact, Mangrum testified that just prior to cessation of business in December of 1988, the corporation had received a shipment from Levi Strauss of inventory having a value of $50,000 to $60,000.

Mangrum and Moran approached Arney on behalf of the corporation again in March of 1988, and requested another "seasonal loan" in the amount of $20,000.00. At this particular time, Arney was aware that the corporation had committed to open a store in the New River Valley Mall in Christiansburg, Virginia, and to move its Blacksburg operation to that new mall. In fact, Arney had participated in the decision to make the move and had helped arrange the financing for it. Arney's testimony at trial indicates that both Mangrum and Moran were very upbeat in their estimates as to the future operation of the corporation. Statements were made to Arney that "this was going to be the corporation's banner year." In short, Mangrum and Moran were enthusiastic about the prospects of the business and communicated this to Arney in connection with their request for a seasonal loan. Arney was under the impression that this loan was for "seasonal inventory" and that it would be paid back from the Fall back to school sales or the December Christmas sales. He testified that he was led to believe by the general demeanor of Mangrum and Moran that the business was doing well.

Plaintiff's exhibit 13 is another letter dated March 23, 1988, from Elesco Factors. This letter is addressed to Mr. Mangrum as treasurer of Alpha Corporation and expresses concerns about the slow down in payment on invoices by the corporation for inventory received. Generally, the letter shows that the corporation had increased the average slow payment from nine days to thirty-four days from 1987 to 1988. The letter made no demand other than a request that an officer of Alpha Corporation contact Elesco Factors. There was no evidence introduced to show if anything further transpired between Elesco Factors and the corporation concerning the slow pay. Arney was not made aware of the Elesco letter. On March 29, 1988, he loaned the corporation $20,000.00. See, plaintiff's exhibit 25. No evidence was introduced at trial to show how the March loan proceeds were applied other than Moran's testimony that the money went into the general account to pay vendors' invoices. Moran testified that there was an understanding between Mangrum, Moran and Arney that from time to time seasonal loans would be made by Arney to the corporation. Arney never disputed this testimony and the circumstances indicate a pattern of loans.

In June 1988, Mangrum and Moran approached Arney for another seasonal loan to the corporation. This time, the loan was for $30,000.00 and it was to be a 90–day note. The understanding was, again, that the loan would be repaid from Fall and Christmas sales. In fact, Arney borrowed the funds on a 120–day note to give the corporation some cushion for repayment and on June 14, 1988, loaned the money to

Alpha Corporation. Plaintiff's exhibit 27. Again, Arney testified that it was represented to him that the corporation was doing well, that sales were okay and that he received no negative input from Mangrum and Moran concerning the day to day business operations of the company. At this time, the company had committed to move the Rocky Mount store to a mall in Danville, Virginia. Arney had participated in the decision to make this move and, again, had arranged for the necessary financing for the move through Signet Bank. Moran testified at trial that the June loan proceeds did go for purchase of Levi Strauss inventory. There was no evidence introduced by Arney to contradict this testimony. The June 14, 1988 loan from Arney to the corporation was the last loan which Arney made to the corporation.

In September and October, 1988, it became apparent that the business was experiencing financial difficulty. Mangrum and Arney had a meeting in September 1988, in which Arney was again approached for funding. He declined to advance any further funds to the corporation. Unknown to Arney, Mangrum thereafter borrowed those funds from his father-in-law and a resident at his father-in-law's home for disabled veterans and then loaned the funds to the corporation.

In October 1988, the 90–day note made in June 1988, came due. No payment from the corporation to Arney was forthcoming and Arney, after obtaining one extension of the loan, made arrangements to service the debt. Mangrum gave Arney a blank corporate check and told Arney to hold it until Mangrum told him how much to make the check for and when to deposit it.

In December of 1988, the financial affairs of the corporation began to collapse. In early December, however, Arney was repaid $15,000.00 of the $30,000.00 June loan. In mid-December, 1988, Mangrum and Moran called an emergency meeting with Arney and disclosed all of the financial affairs of the corporation to him. The picture which Arney saw was bleak. Plaintiff's exhibit 28 contains handwritten notations which the parties wrote down and reviewed at a December 16, 1988 emergency meeting. Exhibit 28 shows the debts owed by the corporation to various entities and lenders. Corporate counsel was consulted on December 20, 1988. Plaintiff's exhibit 29. Again, the debt structure of the company was reviewed and various alternatives for resolution of the financial problems of the corporation was discussed. Specifically, one of the options considered was the filing of a Chapter 11 petition.

Arney's testimony is that he was shocked by the December 16, 1988 emergency meeting and what transpired thereafter. Up until December 1988, he believed the corporation was doing well.

After December 20, matters began to deteriorate quickly. It became apparent that inventory from Levi Straus had not been received for sale during the Christmas season and Christmas sales had not been what Mangrum and Moran had predicted. They both testified that they were relying on Christmas sales to try to salvage the business. In discussion with corporate counsel, it was clear that Arney's personal assets were in jeopardy and that Mangrum and Moran were judgment proof. Discussions were directed to corporate strategy to protect Arney. Counsel for the corporation advised that the interests of the individual stockholders and the corporation might create conflicts for corporate counsel. Upon recommendation of corporate counsel, Mangrum, Moran and Arney each retained their own attorneys to represent their interests.

From December 20, 1988, through December 31, 1988, a series of meetings was held to discuss the fate of the corporation. These meetings culminated in a meeting at the office of Michael Aheron, corporate counsel, on Saturday, December 31, 1988, to structure an agreement under which Arney would take over the operation of the corporation and relieve Mangrum and Moran of both their day to day duties and their ownership interest in the corporation. The negotiations culminated in a memorandum of understanding dated December 31, 1988. Plaintiff's exhibit 31. This was an agreement between the individual stockholders

of the corporation and did not involve the corporate entity. In summary, it provided that Arney would take an assignment of the stock ownership of Mangrum and Moran and become the sole stockholder in Alpha Corporation. In exchange, Arney would assume the liabilities of the corporation. It should be noted at this point that Arney was personally liable on all of the loans which had been made to the corporation by lending institutions with the exception of a Signet Bank loan in the amount of $60,000.00. However, he agreed to assume that obligation personally as part of the agreement. Paragraph 5 of the memorandum of understanding states:

> 5. The parties by their execution hereof acknowledge & agree that the advice & counsel provided by their respective attorneys in the negotiation and preparation of this Memorandum of Understanding is expressly dependent and conditioned upon the accuracy and completeness of the information furnished by each, the truth & accuracy of which information is hereby expressly warranted.

Arney also agreed to hold Mangrum and Moran harmless with respect to any claims which might arise out of the operation of the corporation.

Evidence at trial shows that the inducement to Arney to enter into the memorandum of understanding was statements made during the course of negotiations by Mangrum and Moran about the level of inventory remaining in the corporation. Arney also testified that he was induced to inject cash into the corporation by statements made by Mangrum and Moran as to the corporation's inability to come up with the cash necessary to bring lease payments in arrears current and retain corporate counsel for a chapter 11 reorganization proceeding. Since the overall strategy to preserve Arney's assets was a corporate Chapter 11, he felt compelled to inject this cash to attempt to salvage as much as he could.

A. Carter Magee, Esquire, represented Arney in the negotiations and testified at trial that his notes show that statements were made by Mangrum and Moran that the company had an inventory with a retail value of $400,000 to $500,000. Magee later learned that cost of inventory was approximately 56% of retail. Therefore, inventory, based upon Magee's testimony would have had a cost basis of $224,000 to $280,000. Moran, in his testimony, does not disagree with Magee's testimony. He stated that the inventory at cost "should have been" $300,000 to $350,000.

Arney testified, and Aheron confirmed, at trial that representations were made by Mangrum and Moran that the corporation had approximately $30,000 in cash in the bank; however, they also represented that there were checks outstanding of approximately $23,000 and that neither they personally nor the corporation had the funds necessary to pay Aheron's required retainer of $15,000 for representation of the corporation in a chapter 11 proceeding.

The negotiations for the memorandum of understanding were conducted throughout the morning of December 31. Early in the afternoon, Aheron left his office to travel to Washington, D.C.; however, counsel for Arney and Mangrum and Moran remained at Aheron's office and arrived at an agreement. Since the agreement had to be reduced to writing, the clients were released for a period of time and returned to the Tanglewood store so that Mangrum and Moran could show Arney around the operation. Prior to December 31, 1988, Arney had no experience in the day to day operation of the company. His exposure to the day to day operation had only been to the extent of visits to the store to meet with Mangrum and Moran. In fact, Moran testified that Arney's role was to advise and assist in making the "big decisions" and that the parties understood and agreed that Mangrum and Moran were responsible for the day to day business operations. During this visit to the Tanglewood operation on December 31, 1988, Arney became aware for the first time that Mangrum had been removing substantial sums from the corporate account to repay loans which he had made to the corporation. These were the loans that had been obtained from Mangrum's father in law and a resident at his father in law's home for disabled veterans. In early December 1988, Mangrum

removed $10,200.00 from the corporation's checking account. Testimony showed that this fund was ultimately paid to the resident at the disabled veterans' home in full satisfaction of that individual's loan to Mangrum. Arney questioned this transaction on December 31, 1988, before he signed the memorandum of understanding.

The parties returned to Aheron's office, signed the memorandum of understanding and returned back to the Tanglewood operation solely for the purpose of permitting Mangrum and Moran to clean out their personal effects. While they were in the office, Moran removed some information from the computer. Arney was not able to testify as to what information was removed. Moran testified that the information he removed was a computer game, a spread sheet application and a word processing application. He testified that he did not erase any corporate accounting records and, in fact, showed Arney certain menus on the computer which contained accounting records. Mangrum and Moran both testified that they showed Arney where all of the accounting records were and Mangrum testified that he showed Arney boxed inventory in the loft of the Tanglewood store. This is the inventory which had been delivered by Levi Strauss too late for the Christmas sales and Mangrum testified that he had calculated the value of that inventory at between $50,000 and $60,000. Once Mangrum and Moran had cleaned out their personal effects, Arney took control of the keys to the operation and had all of the locks changed that evening.

Beginning on January 3, 1990, Arney began to uncover additional surprises. First, he had the corporation's accountant come to the business to organize the accounting records and give him a statement of the company's financial condition. The accountant testified at trial that he was unable to comply with the requested engagement because of the lack of corporate records. Specifically, he testified that he was unable to find any records on the computer and was unable to find a general ledger or other accounting records necessary to the preparation of the financial report.

Part of the memorandum of understanding was that Moran would remain president of the company until dismissed by Arney. The purpose of this provision was to permit Moran to sign the chapter 11 petition and schedules and statement of affairs since Arney did not want his individual name associated with the filing. Moran was to sign the petition as soon as it was prepared by Aheron. However, there was a delay in Moran's execution of the petition and it was not filed until January 5, 1990. Arney, after the filing of the petition, proceeded to attempt to open a debtor in possession account and close the business's operating account. He found, in attempting to close the operating account for the business, that there was virtually no cash in the account and that on December 31, 1988, Mangrum had written himself a check for $15,000.00. Mangrum did not disclose to Arney during the course of the negotiations that he had written this check and did not include in his statement during the negotiations this sum in the amount of cash on hand in the corporation's checking account. Mangrum did testify that Moran did not know that he had written the $15,-000.00 check. In any event, Mangrum testified that he had deposited the check in his bank on the morning of December 31 before he went to the meeting to complete the negotiations for the memorandum of understanding. Plaintiff's exhibit 36 shows a balance in Mangrum's personal checking account on January 3, of $15,-667.48. Plaintiff's exhibit 35 shows the check which Mangrum wrote being paid by Sovran Bank on January 3, 1989. Arney attempted to stop payment on the $15,-000.00 check but was unsuccessful. By the time Arney had discovered Mangrum's check, he had already deposited with Aheron the $15,000.00 retainer required by Aheron for the corporate chapter 11 and the sum of $29,300.00 required by the various landlords to cure the lease defaults and permit the stores to remain open.

The next surprise which Arney received was the inventory valuation. On January 5, 1989, Arney instructed each of the store managers at the four locations to take in-

ventory so that an accurate inventory could be provided to Aheron for his preparation of the chapter 11 schedules. The compiled inventory at cost was valued at $151,-000.00.

Evidence at trial showed that the corporation had a substantial amount of cash during the month of December. In addition to the loans which Mangrum repaid to himself, totaling $25,200.00 and the $15,-000.00 loan which Arney was repaid, the corporation, just prior to December 31, 1988, made a substantial payroll tax deposit to cover payroll tax liability to the federal and state taxing authorities. Evidence also revealed that between Christmas and New Year's Eve, the store had conducted a two for one sale of Levi Strauss jeans. This sale is what precipitated Arney's anxiety to assume control of the business. Since cost of Levi Strauss inventory was 56% of retail it appeared to him that a two for one sale was a sale of inventory at below cost.

This rather lengthy and sad saga of the business affairs of Alpha Corporation ended in the Spring of 1989 when the corporation converted to a chapter 7.

On October 10, 1989, Arney filed the above-referenced adversary proceedings.

*Law*

█ This case breaks down into two distinct segments. The first segment deals with the loan transactions which Arney made to the corporation in February, March and June of 1988. It is clear that the loans which Arney made were to the corporation. He now seeks to hold the individual officers and directors, Mangrum and Moran, liable for this corporate debt. In order to prevail on this aspect of his cause of action, it is necessary for Arney to succeed in piercing the corporate veil which would shield Mangrum and Moran from liability for debts of the corporation. The leading case in the Fourth Circuit concerning piercing of the corporate veil is *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (1976). In the *DeWitt* case, the Fourth Circuit set forth the factors which a court should consider in piercing the corporate veil when the theory

for piercing the corporate veil is that the individual stockholders and/or officers and directors use the corporation as their "instrumentality" or "alter ego." The plaintiff in this case made no such claim and offered no evidence as to the factors which would be necessary in order to pierce the corporate veil under the instrumentality theory. Instead, Arney proceeds on the theory of fraud as the basis for piercing the corporate veil to recover against Mangrum and Moran. Fraud can be the basis for disregarding the principal of limited liability which is a hallmark of the corporate entity. In *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944), the Supreme Court of the United States held:

> Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted. But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied. Mr. Justice Cardozo stated that a surrender of that principal of limited liability would be made 'when the sacrifice is essential to the end that some accepted public policy may be defended or upheld.' Citations omitted. The cases of fraud make up part of that exception. Citations omitted.

Thus, Arney must prove by a preponderance of the evidence that Mangrum and Moran defrauded him in obtaining for the corporation the loans made in February, March and June 1988. *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir.1988), *In re Showalter*, 86 B.R. 877, 880 (Bankr.W.D. Va.1988).

The decided cases in the Fourth Circuit are uniform that both caution and reluctance should be exercised when considering a piercing of the corporate veil. *In re Criswell*, 52 B.R. 184, 194 (Bankr.E.D.Va. 1985). Further, the elements for establishing fraud are well known. They are: (1) that the debtors made representations; (2) that at the time of the making of the representations the debtors knew they were false; (3) that the debtors made them

with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the loss alleged and damage as a result of the representations having been made. *Id.* at 196.

With respect to the three loans, Arney alleges that representations were made that sales were "okay" and that the business was doing well. Further, he alleges that representations were made that the loan proceeds would be used for the purchase of inventory so that the corporation could have a "banner year."

Arney, as a stockholder and director of the company, had available to him any financial information about the organization. However, he relied on the individuals, Mangrum and Moran, to operate the business, and he relied, primarily, on general statements from them that sales were "okay." The testimony of both Arney, Mangrum and Moran at trial was to the effect that Arney would inquire about sales, not only of Mangrum and Moran but of the sales staff at the Tanglewood store operation. Other than that, Arney never asked for any financial information at the various times he made the loans to the corporation. There is no evidence in the record that sales were not "okay" in February, March and June of 1988. In fact, there is no evidence as to the definition of any party of the term "okay." Therefore, the court finds that Arney has not carried his burden of proof as to the falsity of representations made. Further, there is no evidence that any statements made by Mangrum and Moran with respect to sales were made with the intent and purpose of deceiving Arney.

Arney also complains that he was deceived in that the loan proceeds were not used to "bolster inventory" for a "banner year." The only evidence introduced as to the use of the loan proceeds came from Mangrum and Moran. Both testified that the funds went into the general account to pay vendors' invoices. Moran explained that it was necessary to pay vendor invoices in order to maintain proper credit relations with suppliers. Thus, while the loan proceeds may have not been used as direct payments to inventory suppliers for new inventory, there is evidence that the funds were used for corporate business purposes to keep the business operating. In particular, vendors' invoices were paid in order to permit credit terms to be maintained for future purchases of inventory on credit. While Arney may have put a different interpretation on the statements made to him in support of the loan request, i.e. that the funds would go directly to payment for new inventory, there is no evidence that the loans did not, in some way, contribute to the acquisition of new inventory. In fact, the evidence is clear that the corporation continued to operate through the latter part of 1988 to the point of receiving a substantial amount of inventory after the Christmas sales. Finally there is no evidence that Arney conditioned his loans on the proceeds being applied directly for payment of new inventory acquisitions. Therefore, the court holds that Arney has failed to carry his burden of proof under 11 U.S.C. § 523(a)(2)(A) and cannot pierce the corporate veil to make Mangrum and Moran liable for these corporate debts. Arney has no claim against Mangrum and Moran for the loans to the corporation made in February, March and June 1988.

The second segment of the case which the court must determine involves the loan made by Arney subsequent to the December 31, 1988 memorandum of understanding in the amount of $15,000.00 to cover the retainer for the corporation's legal representation in the chapter 11 proceeding and the $29,300.00 he loaned to the corporation to bring store leases current.

It is clear from the evidence that statements were made during the course of negotiation for the memorandum of understanding as to the amount of cash which was on hand in the corporate checking account. During these negotiations, Mangrum stated to Arney in the presence of corporate counsel and Moran that $30,000.00 was in the corporate checking account and that $23,000.00 of checks were outstanding. Both Mangrum and Moran represented to corporate counsel and to

Arney that there were not sufficient funds in the corporate checking account to pay the $15,000.00 retainer. Moran was unaware that Mangrum had removed $15,-000.00 from the corporate checking account in order to repay his father-in-law for the loan his father-in-law had made to Mangrum for corporate purposes in the Fall of 1988.

The context in which this representation was made was in negotiations between the individual stockholders for Arney's takeover of the corporate entity. Mangrum knew at the time he made the statement to Arney that there was, in fact, $45,000.00 in the checking account. He had deposited, he testified, the $15,000.00 check into his personal account on Saturday morning, December 31, 1988. The bank did not credit the deposit until January 3, 1989. Mangrum withheld the information concerning the $15,000.00 check and the availability of corporate funds from Arney during the course of the negotiations. The court finds that Mangrum made a representation as to the amount of cash in the corporate checking account, knew that that representation was false, and made the representation with the intention and purpose of inducing Arney to put the $15,000.00 into the corporation for the retainer, Arney relied on the representation, made the loan to the corporation and suffered a loss. Having fulfilled all of the elements to establish fraud, the corporate veil will be pierced and Arney has a claim against Mangrum in the amount of $15,000.00 and that sum shall be nondischargeable in Mangrum's chapter 7 proceeding.

■ The next issue to be determined involves Arney's loan to the corporation of the sum of $29,300.00 for purposes of bringing lease payments current so that the corporation could operate in its business facilities during the chapter 11 proceeding. Two facts were critical to Arney in making a decision as to the takeover of the corporation and the injection of these funds to bring the leases current. First, he was concerned about the two for one sale which was depleting inventory. Second and related to the first concern, was Arney's belief that a sufficient amount of inventory needed to be preserved when the corporation went into a chapter 11 proceeding if it was to reorganize. The evidence is clear that Arney hoped to be able to operate the business long enough to attract a buyer who would absorb some or all of the corporate debt for which Arney was personally responsible. It is also clear that both Mangrum and Moran represented during the negotiations that inventory had a retail value of $400,000 to $500,000. An inventory conducted by the store managers the first week of January 1989 revealed an inventory of $151,000. Neither Mangrum nor Moran testified at trial as to what the inventory value was on December 31, 1988. Moran did testify that the inventory "should have been" $300,000 to $350,000. Moran and Mangrum never denied that they made the representations to Arney as to the amount of inventory as of December 31, 1988.

The circumstances surrounding the negotiations for the memorandum of understanding indicate that both Mangrum and Moran were willing to say almost anything in order to achieve the end result. The court finds the following facts to be relevant: (1) the corporate business was clearly lost as far as Mangrum and Moran were concerned. They had made this abundantly clear to Arney at the December 16, 1988 emergency meeting when plaintiff's exhibit 28 was shown to Arney; (2) the agreement which they were negotiating on December 31, 1988, would relieve them of any corporate liability.

■ Mangrum and Moran also knew that the corporation had been conducting a two for one sale and that a significant amount of cash had been accumulated and spent in the month of December. Thus, they had to know that the inventory had been sold down. On balance, taking into account the inventory figure which was generated by the store managers in the first week of January 1989, the court concludes that Mangrum and Moran had to know that the representation which they made to Arney as to the level of inventory on December 31, 1988, was wrong or they made the

statements with a reckless indifference to the truth. Reckless disregard for the truth or falsity of a statement constitutes a false representation under § 523(a)(2)(A). *Birmingham Trust National Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985). The statements pertaining to inventory value when coupled with the statements pertaining to the corporation's cash position show a pattern of conduct during the negotiations which exceed negligence. *In re Zack*, 99 B.R. 717, 722 (Bankr.E.D.Va.1989). The court is satisfied that both Mangrum and Moran were willing to paint as bright a picture as might be necessary in order to induce Arney to sign the memorandum of understanding. Based upon the representations as to both cash and inventory level, Arney agreed to inject $29,300.00 into the corporation to pay back rent. The court finds that all of the elements necessary to prove fraud have been proved by a preponderance of the evidence, that the corporate veil should be pierced and that the loan by Arney to the corporation in the amount of $29,300.00 should be nondischargeable in the bankruptcy proceedings of both Mangrum and Moran.

 Arney, in connection with the memorandum of understanding, assumed a $60,-000.00 corporate debt at Signet Bank which he was not liable for prior to assumption. The court finds that Arney could not have relied on the representations made by Mangrum and Moran during the negotiation for the memorandum of understanding when he assumed this loan since he voluntarily assumed the loan after he had learned what the true inventory figures were and what the cash position of the bank was as of December 31, 1988. Therefore, the elements necessary to prove fraud have not been proven and Arney cannot pierce the corporate veil to hold Mangrum and Moran liable for the $60,000.00 Signet loan.

The complaint also alleges a count based on breach of fiduciary capacity under 11 U.S.C. § 523(a)(4). Since there must be an express or technical trust in order to utilize 11 U.S.C. § 523(a)(4) to deny dischargeabili-

ty, Arney's count fails. *In Re Criswell*, 52 B.R. 184, 201 (Bankr.E.D.Va.1985).

Arney also asserted that the $50,000.00 loan made to Alpha Corporation for the New River Valley store was nondischargeable. However, as stated on the record at trial, the court finds no evidence that any false representations were made to induce Arney to make this loan and, in fact, the funds were utilized by the corporation for the New River Valley Mall store. Accordingly, Arney cannot pierce the corporate veil to claim against Mangrum and Moran in their individual bankruptcy proceeding.

Arney admitted at trial that the Crestar and Salem Bank loans made to the corporation were not the subject of any fraud perpetrated by Mangrum and Moran and, accordingly, he may not pierce the corporate veil to claim against Mangrum and Moran.

 The final count which must be determined is the count under 11 U.S.C. § 727(a)(3). Arney claims that the discharge of all of the debts listed by Mangrum and Moran should be denied under this Code section. The Code section reads as follows: "(a) the court shall grant the debtor a discharge, unless—(3) the debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." (Emphasis added).

The court holds that 11 U.S.C. § 727(a)(3) is not available to Arney to deny the individual debtors their discharges. The plain language of the statute deals with "debtor's financial condition." The only evidence we have in this case is that there was insufficient corporate records to determine the corporation's financial condition. There is no evidence the debtors failed to keep their own records or that the corporation's records were necessary to determine the individuals' financial condition. Accordingly, Arney's count under 11 U.S.C. § 727(a)(3) fails.

An appropriate order will be entered implementing this memorandum opinion.

## ORDER

At Roanoke in said District this 26th day of October, 1990:

A consolidated trial in the above adversary proceedings was held on September 20 and 21, 1990. After the plaintiff rested his case in chief, both defendants, through their respective counsel, moved for directed verdicts. Based upon the findings set forth in the record of this proceeding pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), and pursuant to the memorandum opinion attached hereto and made a part hereof, it is

## ORDERED:

That, pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b), the plaintiff's case is DISMISSED as to the count of the complaint requesting nondischargeability under Bankruptcy Code Section 523(a)(4). It is

## FURTHER ORDERED:

That, pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b), the plaintiff's case is DISMISSED for so much of the count of the complaint requesting nondischargeability under Bankruptcy Code Section 523(a)(2)(A) as pertains to the $60,000.00 loan to Alpha Corporation from Signet Bank. It is

## FURTHER ORDERED:

That, pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b), the plaintiff's case is DISMISSED for so much of the count of the complaint requesting nondischargeability under Bankruptcy Code Section 523(a)(2)(A) as pertains to the $50,000.00 loan to Alpha Corporation for the New River Valley store. It is

## FURTHER ORDERED:

That, pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b), the plaintiff's case is DISMISSED for so much of the count of the complaint re-questing nondischargeability under Bankruptcy Code Section 523(a)(2)(A) as pertains to both the Crestar and Salem Bank loans in their respective amounts. It is

## FURTHER ORDERED:

That the request for denial of discharge based upon 11 U.S.C. § 727(a)(3) be and it hereby is DENIED. It is

## FURTHER ORDERED:

That the corporate veil is pierced and the discharge of David M. Mangrum is DENIED pursuant to 11 U.S.C. § 523(a)(2)(A) in the amount of $15,000.00, and judgment is entered in favor of J.C. Arney for $15,000.00 together with interest at the federal judgment rate from the date of docketing of this order in the clerk's office of the bankruptcy court until paid. It is

## FURTHER ORDERED:

That the corporate veil is pierced and the discharge of Matthew T. Moran and David M. Mangrum is DENIED pursuant to 11 U.S.C. § 523(a)(2)(A) in the amount of $29,300.00, and judgment is entered against Matthew T. Moran and David M. Mangrum, jointly and severally, in favor of J.C. Arney for $29,300.00 together with interest at the federal judgment rate from the date of docketing of this order in the clerk's office of the bankruptcy court until paid. The balance of the claims of J.C. Arney under 11 U.S.C. § 523(a)(2)(A) are DENIED and the discharge shall issue.