In re Joseph B. **KETANER**, Debtor.

**WESTERN UNION CORPORATION,**
**Plaintiff,**

v.

**Joseph B. KETANER, Defendant.**

**Bankruptcy No. 91–20962–T.**
**Adv. No. 91–2115–T.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Dec. 31, 1992.

See also 149 B.R. 395.

Joseph R. Lassiter, Jr., Laura O. Stackhouse, Hofheimer, Nusbaum, McPhaul & Samuels, P.C., Norfolk, VA, for plaintiff.

Harry W. Jernigan, III, Virginia Beach, VA, for debtor.

### *MEMORANDUM OPINION*

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

This adversary proceeding came on for trial on May 14, 15 and 18, 1992, upon the

plaintiff's complaint to except certain debts from discharge pursuant to §§ 523(a)(2), (a)(4), and (a)(6). At trial the plaintiff narrowed its presentation, focusing primarily on § 523(a)(2)(A). The complex history of the debtor's company and its relationship with the plaintiff necessitate extensive findings of fact.

For the reasons set forth in this opinion the court concludes that $87,614.91 of the $204,689.90 debt in issue is an obligation of debtor to plaintiff, which is excepted from discharge under 11 U.S.C. § 523(a)(2)(A):

### Findings of Fact

The debtor Joseph B. Ketaner was experienced in managing door-to-door direct sales organizations. In January 1988 he became involved in the formation of a company known as Galaxy–Wide Products, Inc., which specialized in direct sales of encyclopedias and other products. Ketaner was hired as a consultant to the company by Galaxy–Wide's President and sole shareholder, William Stafford, II. In April 1989 Ketaner obtained 75% ownership of Galaxy–Wide, and in October he was named chairman of the board of directors.

Galaxy–Wide experienced cash-flow problems from its inception. Ketaner testified that these problems were inherent in the direct sales business. He explained that because the company sold its products on a credit installment basis it did not receive cash up front. Accordingly, it was very difficult to immediately pay the commissions of salespeople. In an effort to obtain short-term financing Galaxy–Wide pursued several avenues that ultimately proved unsuccessful. One of these avenues was an account with plaintiff Western Union Corporation.

Since Galaxy–Wide employed its sales force on a strict commission basis, it was necessary for the company to be able to wire commissions directly to its salespeople in the field. In January 1988 Galaxy–Wide achieved this end by setting up an account with Western Union. The account was operated through Western Union's commercial money transfer ("CMT") system and allowed Galaxy–Wide to wire transfer money anywhere in the United States. The agreement between the parties provided:

> Before 12:00 midnight of each day, [Galaxy–Wide] will deposit with the U.S. Postal Service for mailing by First Class Mail, . . . a good check in full payment of all Money Orders sent by [Galaxy–Wide] the previous day and all [Western Union] charges.[1]

Galaxy–Wide paid a service charge of $9.00 for each CMT. Individual transfers were limited to $2,000.00, but nothing prevented Galaxy–Wide from issuing more than one CMT to the same person on the same day. Additionally, CMTs were supposed to be issued to a person and not a corporation or other entity.

Galaxy–Wide's daily total CMT limit was initially $7,000.00 and was eventually raised to $9,000.00. According to the testimony of plaintiff's employee, Ruth Williams, it was Western Union's policy to routinely allow requests to exceed the daily limit by 50% or less, and these requests could be approved directly by a Western Union operator. If a customer wished to exceed its daily limit by more than 50% Western Union required the approval of one of its operations managers.

Galaxy–Wide was required to post a $35,-000.00 letter of credit as security for CMT advances on its account. This amount represented five days of CMT activity at the maximum daily level of $7,000.00. When the daily limit was raised to $9,000.00, Galaxy–Wide was required to post an additional $10,000.00 certificate of deposit to cover Western Union's increased exposure. Western Union did not charge interest, fi-

---

1. (Plaintiff Exhibit 2) (Money Order Acceptance Agreement). At the time of the agreement, Western Union referred to commercial money transfers as commercial money orders.

Galaxy–Wide's Office Manager, Anne Roux–Lenbergs, testified that it was her understanding that Galaxy–Wide had 5 days within which to provide Western Union with funds for each day's CMT activity. Apparently it was Western Union's policy to wait at least 5 days before it considered payment late in order to allow time for payment checks to reach its headquarters in Missouri. *See* Defendant Exhibit A13.

nance charges, or late charges for the CMTs, nor was any truth in lending disclosure provided.

Throughout its history, Galaxy–Wide used the Western Union CMT account as a method of short-term financing. This was accomplished by having Western Union "wire" money to Galaxy–Wide employees working at the headquarters in Virginia Beach. The employees would pick up cash from the nearby Western Union office and either deposit it into one of the corporate bank accounts or deliver it directly to the company headquarters. Nothing in the Western Union contract prohibited Galaxy–Wide from using its CMT account in this way.

Galaxy–Wide eventually amassed an unpaid CMT account balance of $256,176.90 as of December 7, 1989. On December 7, 1989, Western Union declared Galaxy–Wide in default under the agreement and applied the $45,000.00 pledged collateral to the unpaid balance. The court notes specifically that from November 28, 1989, through December 7, 1989, Galaxy–Wide charged *$87,-614.91* in money transfers and service fees to its CMT account. (Plaintiff Exhibit 15). Western Union was able to stop payment of $6,487.00 in CMTs which had not yet been cashed, but Galaxy–Wide has never repaid the remaining amount due of *$204,-689.90.*

Galaxy–Wide tendered 15 checks in an attempt to reimburse Western Union for the charges incurred in November 1989. However, 13 of these checks (totalling $114,960.59) were returned due to non-sufficient funds by People's Bank of Virginia Beach. (Plaintiff Exhibits 1, 15, 25) In the past People's Bank had routinely honored Galaxy–Wide's overdrafts in what had developed into another method of short-term financing.

Galaxy–Wide was often overdrawn on its People's Bank account, and the bank had a history with Galaxy–Wide of honoring overdrawn checks based on Galaxy–Wide's

assurances that it would soon deposit monies to cover the overdrafts. In this way, the bank could charge Galaxy–Wide a $20.00 service fee for overdrafts, yet rely on the eventual deposit of sufficient funds. Bank personnel viewed these transactions as "mini-loans" with a high interest rate in the form of the $20.00 service fee. Occasionally, People's Bank would not honor a Galaxy–Wide check until funds were in place. In these instances Galaxy–Wide would often ask its payee to re-deposit the check, assuring clearance.

People's Bank continued this practice until late November 1989, at which time the bank refused to honor Galaxy–Wide checks because the overdraft balance had reached unacceptable levels.[2] In all, People's Bank dishonored 13 checks made payable to Western Union. The checks were dated November 10 through November 22, 1989, and totaled $114,960.59.

In the previous Spring and Summer of 1989 Galaxy–Wide pursued another method of short-term financing for its operations. Between May 1, 1989, and July 27, 1989, Galaxy–Wide executed several promissory notes made payable to Tidewater Capital Corporation ("TCC") in exchange for a total of $2,500,000.00 in cash, paid out through numerous loans. Galaxy pledged all of its assets and accounts receivable as security for the notes. As a condition of the security agreements, Galaxy–Wide was not permitted to sell, assign, or otherwise dispose of any of its receivables. These loans became a dominant source of cashflow for Galaxy–Wide.

In August 1989 Galaxy–Wide defaulted on the TCC notes. Additionally, TCC then discovered that receivables had been sold to Bencharge Credit Service of America, Inc., in violation of TCC's security agreement. Accordingly, TCC cut off funding to Galaxy–Wide on or about August 22, 1989.

From August to mid-November 1989 negotiations ensued between TCC and Galaxy–Wide over various proposals of Ketan-

---

**2.** On November 30, 1989, the Galaxy–Wide account at People's Bank was overdrawn by $101,-390.18. A bank employee testified that he had been out of his office during most of the latter part of November. Upon returning to discover the increased overdraft balance he began dishonoring Galaxy–Wide checks.

er (who had personally guaranteed the notes) to obtain funds with which to pay TCC. These negotiations included at least some discussion of maintaining a lender-borrower relationship. The negotiations were ultimately fruitless, and on November 20, 1989, TCC filed suit against Galaxy–Wide and Ketaner. On November 22, 1989, the Circuit Court of the City of Virginia Beach entered an order directing the Sheriff to seize Galaxy–Wide's assets and receivables, and on *November 28, 1989, the order was executed.*

The sheriff was unable to seize all of the company's receivables contracts because a number of them had been placed in the possession of Celia Stern, an unsecured creditor of Galaxy–Wide and friend of the Ketaner's. Galaxy–Wide contended that TCC could not seize these receivables because its security interest had not been properly perfected. On December 6, 1989, the parties reached a settlement whereby Ketaner was released from personal liability as guarantor on the notes to TCC. In return, TCC kept the contracts it had seized. Also, Ketaner turned over the receivables contracts that had been given to Stern in exchange for TCC's payment to Stern of $500,000.00. Lastly, Galaxy–Wide was to aid in collecting outstanding receivables.

The settlement agreement with TCC left Galaxy–Wide without financing to generate new accounts. However, throughout 1989 Ketaner explored numerous financing possibilities for Galaxy–Wide. The deal with TCC was consummated in the Summer of that year. When Galaxy–Wide fell behind in its payments, negotiations ensued throughout the Fall in a desperate attempt by Galaxy–Wide to continue a financing arrangement.

In addition to negotiations with TCC Ketaner attempted to strike deals for the sale of Galaxy–Wide receivables at a discount in exchange for cash. An agreement of this type was reached with Bencharge Credit Corporation in the Summer of 1989. Ke-

taner also engaged in serious discussion with companies known as Federated Credit Corporation and Academic International, Inc., but was unsuccessful in producing an agreement. Ultimately, Ketaner was unable to obtain sufficient operating funds, and Galaxy–Wide was forced to close its doors.

### *Position of Parties*

#### WESTERN UNION.

Western Union argues that Ketaner defrauded it by deliberately causing funds to be sent both to salespeople in the field and to employees at headquarters via the CMT system at a time when the debtor knew that Galaxy–Wide had no money on hand to pay for the transfers nor any reasonable likelihood of obtaining cash in the foreseeable future. It compares this case to one in which the debtor amasses a large credit card bill on the eve of bankruptcy without any intention or ability of repayment.

Western Union points to several factors to support its position:

(1) that at the time the transfers in question took place negotiations with TCC had broken down, and Galaxy–Wide's accounts receivable had been seized;

(2) that Galaxy–Wide was overdrawn on its People's Bank account and made no deposits to remedy the situation with the exception of one $109.00 deposit in November 1989;

(3) that Galaxy–Wide was insolvent at the time it requested CMT payments;

(4) that Galaxy–Wide often exceeded its $9,000 daily CMT limit but did not exceed that limit by more than 50% so as not to raise a "flag" with Western Union officials who would have been required to approve such transactions;

(5) that when one of the initial checks written to pay Western Union bounced, Galaxy–Wide "bought time" to incur additional transfer charges by informing Western Union that the check would clear if re-deposited.[3]

---

**3.** Plaintiff asserts that after it received notice on November 28, 1989, from Boatman's Bank that a Galaxy–Wide check for $4,901.20 would not be

honored, Galaxy–Wide's office manager instructed that the check be run through again. (Plaintiff's Trial Memorandum, p. 25). It is

Western Union also alleges that Ketaner was the driving force behind Galaxy–Wide from the beginning and that he was ultimately responsible for CMT usage. Galaxy–Wide's office manager Anne Roux–Lenbergs testified that Ketaner had a daily knowledge of CMT usage during the time period in question and that he was aware of the outstanding balance owed to Western Union.

Western Union asserts Ketaner's conduct amounts to fraud. It seeks to hold him liable for Galaxy–Wide's debt upon two theories. First, that as a perpetrator of fraud Ketaner is liable for the direct damages caused by his actions. Under this theory it would be unnecessary for the court to "pierce the corporate veil" in order to hold Ketaner liable. Instead, Western Union takes the position that Ketaner's actions constitute a separate tort for which the he owes an individual, non-dischargeable, debt. In the alternative, Western Union asserts that the court should find Galaxy–Wide to be the "alter-ego" of Ketaner. The court could then "pierce the veil" to hold Ketaner individually responsible for Galaxy–Wide's debt.

KETANER.

Ketaner contends that the Western Union agreement was, in effect, a line of credit whereby Western Union agreed to extend immediate cash in exchange for repayment plus a service fee within 5 days. He points to the fact that there were no restrictions on local transfers in the written agreement.

Additionally, Ketaner asserts that Galaxy–Wide had every intention to repay Western Union. He testified that he was constantly searching for ways to negotiate new financing to pay the short-term debts of the company. Ketaner points to the ultimate settlement of the dispute with TCC and his numerous inquiries into possible financing arrangements with others as a display of his sincere intent to acquire funding for Galaxy–Wide. Moreover, Ketaner contends that Galaxy–Wide's past

history with People's Bank was sufficient to warrant his believing that the bank would continue to honor overdrawn checks. Finally, Ketaner asserts that the debt in question is corporate debt for which he is not individually liable.

### Discussion and Conclusions of Law

■ At the outset, I note my agreement with Western Union's argument that to the extent of any fraudulent conduct by Ketaner, he may be held directly liable to Western Union notwithstanding that the debt in issue was actually incurred by Galaxy–Wide. *See Arney v. Moran (In re Moran)*, 120 B.R. 379, 387 (Bankr.W.D.Va.1990); *see also McMillan v. Firestone (In re Firestone)*, 26 B.R. 706, 714 (1982) (citing *Lobato v. Payless Drug Stores, Inc.*, 261 F.2d 406, 408–09 (10th Cir.1958)). Therefore, I find it unnecessary to consider issues concerning the piercing of the corporate veil of Galaxy–Wide.

■ Section 523(a)(2)(A) of the Bankruptcy Codes excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud …" 11 U.S.C. § 523(a)(2)(A). It is well settled that the plaintiff challenging dischargeability under § 523(a)(2)(A) bears the burden of proof by a preponderance of the evidence to establish the following common law elements of fraud:

(1) that the debtor made misrepresentation or committed other fraud;

(2) that at the time the debtor knew the conduct was fraudulent;

(3) that the debtor's conduct was with the *intention and purpose* of deceiving or defrauding the creditor;

(4) that the creditor relied on the debtor's representations or other fraud; and

unclear from the evidence presented at trial whether these instructions were given or carried out.

(5) that the creditor sustained loss and damage as the proximate result of the representations or fraud.[4]

In many cases the most difficult element of fraud to establish is that the debtor intended to defraud the creditor at the time of obtaining money or credit. Since the court seldom has direct evidence of a fraudulent intent, the question of intent must usually be resolved by an examination of surrounding circumstances. *In re Fravel*, 143 B.R. 1001, 1007 (Bankr. E.D.Va.1992); *Central Fidelity Bank and Virginia First Savings Bank, F.S.B. v. Higginbotham (In re Higginbotham)*, 117 B.R. 211, 214 (Bankr.E.D.Va.1990); *Seery v. Basham (In re Basham)*, 106 B.R. 453, 457 (Bankr.E.D.Va.1989). When a creditor introduces circumstantial evidence which gives rise to an inference the debtor intended to defraud, the debtor cannot overcome that inference with an unsupported assertion of honest intent. *In re Fravel*, 143 B.R. at 1010 (citations omitted).

Additionally, where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to rely on it, intent to deceive may logically be inferred. *In re Fravel*, 143 B.R. at 1010 (citations omitted). However, according to Bankruptcy Courts in Virginia, the recklessness must exceed negligence and rise to the level of reckless disregard for truth. *In re Fravel*, 143 B.R. at 1010; *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830, 834 (Bankr.E.D.Va.1991); *Arney v. Moran (In re Moran)*, 120 B.R. 379, 390 (Bankr. W.D.Va.1990); *Cowher's Trucking, Inc. v. Zack (In re Zack)*, 99 B.R. 717, 722 n. 7 (Bankr.E.D.Va.1989).

As evidence of fraudulent intent Western Union relies heavily upon its assertion that from the outset Galaxy–Wide and Ketaner abused the CMT account by treating it as a line of credit. Although Western Union vehemently argues it was not providing "credit" to Galaxy–Wide through the CMT account, this assertion is contrary to the facts. Western Union habitually allowed Galaxy–Wide several days to submit payment for its CMT activity. Likewise, Western Union regularly approved transfers in excess of Galaxy–Wide's CMT daily limit and routinely acquiesced when Galaxy–Wide drew amounts over the $45,000.00 it pledged as security. Nothing in the contract prohibited Galaxy–Wide from using the CMT account as it did, and the court is unimpressed by Western Union's claim that there was an unwritten policy to the contrary.[5] It simply defies reality to suggest the CMT account was not a "credit" arrangement. Therefore, the court concludes that Galaxy–Wide's use of the CMT account as a method of short-term financing is not evidence of intent to defraud.

Western Union's strongest circumstantial evidence of fraudulent intent is Galaxy–Wide's tendering bad checks for payment on its CMT account and telling Western Union to re-deposit the returned checks a second time.[6] Western Union be-

**4.** See e.g., *Lawyers Title Insurance Company v. Pitt (In re Pitt)*, 1991 WL 521107, at *5, 1991 U.S.Dist. LEXIS 15853, at *5 (E.D.Va. Mar. 20, 1991); *United Leasing Corporation v. Roop (In re Roop)*, 48 B.R. 310, 311 (E.D.Va.1985); *In re Fravel*, 143 B.R. 1001, 1007 (Bankr.E.D.Va. 1992); *Zedd v. Sandler (In re Sandler)*, 143 B.R. 67, 70 (Bankr.E.D.Va.1992); *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830 (Bankr.E.D.Va. 1991); *Central Fidelity Bank and Virginia First Savings Bank, F.S.B. v. Higginbotham (In re Higginbotham)*, 117 B.R. 211, 214 (Bankr. E.D.Va.1990); *Seery v. Basham (In re Basham)*, 106 B.R. 453, 457 (Bankr.E.D.Va.1989) (citing *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D.Va.1967)) (emphasis added).

**5.** A Western Union employee testified that the company's policy was to restrict CMT usage to areas outside a 50 mile radius of a customer's base. Another employee testified that she spoke with the debtor specifically to make him aware of the policy against allowing transfers to the customer's home base for the purpose of providing short-term financing. These policies were apparently unwritten, and Western Union did not employ any systematic method of monitoring enforcement. As a result Western Union customarily "wired" money to Galaxy–Wide's headquarters.

**6.** Although an indicia of fraud, there is a split of authority whether issuance of a worthless check, without more, is fraud. *See e.g., Supercom, Inc. v. Levitsky (In re Levitsky)*, 137 B.R. 288 (Bankr.E.D.Wis.1992). This court has held it is not. *See In re Basham*, 106 B.R. 453 (Bankr.E.D.Va.1989).

lieves this is clear evidence that Ketaner, who controlled the actions of Galaxy–Wide, intended to "buy more time" to further defraud Western Union. The court does not find this circumstance compelling.

The debtor produced uncontroverted evidence on the course of dealing between Galaxy–Wide and People's Bank of Virginia Beach. The evidence clearly shows it was standard operating procedure for People's Bank to honor Galaxy–Wide's overdrafts. The bank's own representative testified that he viewed this practice as providing Galaxy–Wide with short-term "miniloans" that were quite profitable to the bank. The court believes this "course of dealing" with People's Bank is sufficient to rebut any presumption that the bounced checks amount to proof of intent to defraud.

■ The strongest argument to be made against Ketaner in this case is under the reckless indifference standard of fraud. Although the evidence shows that Ketaner was continuously striving to obtain financing for his operations, conduct which is inconsistent with fraud, as of November 28, 1989, Galaxy–Wide's financial situation was extremely desperate. On November 28, 1989, the sheriff seized Galaxy–Wide's assets, effectively shutting down Galaxy–Wide. At this point Ketaner knew or should have known that his situation was so hopeless as to preclude any reasonable objective possibility of being able to repay Western Union for CMT charges incurred on November 28, 1989, and thereafter. Accordingly, I conclude that as of November 28, 1989, the evidence shows Ketaner's use of the CMT account *exceeded negligence,* and rose to the level of conscious and reckless indifference to the consequences. However, the specific facts and circumstances of Ketaner's business history and course of dealing with Western Union, People's Bank, and TCC lead the court to conclude that prior to November 28, 1992, fraudulent intent cannot be logically inferred under the "reckless indifference" standard.

This court recently considered and applied "reckless indifference" as proof of fraud in *In re Woolley,* 145 B.R. 830 (Bankr.E.D.Va.1991). In *Woolley* I explained that:

> Reckless conduct refers to unreasonable conduct in disregard of a know or obvious risk from which it is highly probable that harm would follow.... It is usually accompanied by a conscious indifference to the consequences.... In contract, negligence is characterized as mere thoughtlessness or inadvertence or simple inattention.... Where the knowledge element is based on recklessness, the conduct must exceed negligence and rise to the level of reckless disregard for truth.

*In re Woolley,* 145 B.R. at 834.

Western Union's alternative argument is that if the CMT account was essentially a short-term credit arrangement then Ketaner's use of the account is analogous to cases involving credit card abuse. To the extent that Ketaner used the account from November 28, 1989 through December 7, 1989, I find the analogy persuasive.

This court considers credit card abuse cases essentially a variation of the reckless indifference standard. *See e.g., Manufacturers Hanover Trust v. Dougherty (In re Dougherty),* 143 B.R. 23 (Bankr.E.D.N.Y. 1992); *Citibank (South Dakota), N.A., v. Rodriguez (In re Rodriguez),* 138 B.R. 112 (Bankr.S.D.Fla.1992). For insolvency to be used to draw an inference of fraudulent intent in credit card abuse cases, it must be hopeless insolvency sufficient to rebut any possibility of good faith. *In re Dougherty,* 143 B.R. 23, 26 (Bankr.E.D.N.Y.1992). As of November 28, 1989, Ketaner's situation was so hopeless as to give rise to an inference of fraudulent intent rebutting any possibility of using the CMT account in good faith.

In summary here, Ketaner's unique business history and course of dealing with Western Union, People's Bank, and TCC overcomes the questionable circumstantial evidence of fraudulent intent prior to November 28, 1989. There is little doubt that Joe Ketaner can fairly be characterized as an inept and overreaching businessman who was constantly scrambling to over-

come financial difficulties. However, the evidence shows that his persistent efforts, brashness and optimism got him out of financial predicaments in the past, and the court finds that prior to November 28, 1989, Ketaner in good faith intended to repay Western Union and believed he could repay Western Union. However, the evidence shows that Ketaner could not have objectively believed he could repay the CMT charges incurred from November 28, 1989 through December 7, 1989.

Accordingly, the plaintiff has proven that only the CMT charges incurred as of November 28, 1989, were procured by fraud and should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

A separate order will be entered.