In re Bailey Martin WELDEN, Debtor.

**BERKELEY FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**Bailey Martin WELDEN, Defendant.**

**Bankruptcy No. 86–2002–8P7.
Adv. No. 86–402.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 7, 1989.

Allan C. Watkins, Frank A. Principe, Tampa, Fla., for defendant.

James E. Foster, Orlando, Fla., for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case, and the immediate matter under consideration is a third amended Complaint filed by the Plaintiff, Berkeley Federal Savings and Loan Association (Berkeley), against the Defendant, Bailey Martin Welden who is also the Debtor, (Debtor), in the above-captioned case. The Complaint sounds in four counts. The claim set forth in Count I of the Complaint seeks to except from discharge a debt allegedly due and owing by the Debtor to Berkeley pursuant to §§ 523(a)(2)(A) on the basis that the Debtor received money from Berkeley by false pretenses. The claim in Count II is based on § 523(a)(4) and seeks to except the debt from discharge based on the allegation that the Debtor committed fraud or defalcation while acting in a fiduciary capacity. Counts III and IV are based upon § 727(a)(2) and (a)(4), and the claims set forth in these Counts seek the denial of the Debtor's discharge based on the allegations that the Debtor with the intent to hinder, delay or defraud his creditors concealed assets of the estate and knowingly and fraudulently made a false oath in connection with his bankruptcy. In opposition, the Debtor contends that the Plaintiff has failed to meet its burden of proof to sustain any of the claims set forth in the Amended Complaint. The facts which are relevant to a resolution of this matter were established at the final evidentiary hearing on the third Amended Complaint and are as follows:

At the time relevant to the matter under consideration the Debtor, an attorney licensed to practice law in the State of Florida, and Richard Barcley ("Barcley") formed a Florida limited partnership known as Polynesian Isles Development, Ltd. ("PIDL"). The Debtor and Barcley were general partners of PIDL which was formed primarily for the purpose of acquiring and developing approximately forty acres of raw land located in Osceola County, Florida, near Disney World and when developed, to sell time-share contracts to the public at large.

The proposed plan of development contemplated construction in three phases. Phase I was to be developed first. The Debtor and Barcley negotiated a construction loan agreement with Guaranty Federal Savings and Loan, now known as Goldome Savings Bank (Guaranty), to finance the construction of Phase I of the project. This construction loan was to be repaid from the sale of time-share weeks.

It appears that sometime after commencement of the construction of Phase I, the Debtor and Barcley sought to obtain financing for the loans which would be generated by the sale of the unit weeks. The mechanics of this type of financing commonly referred to as "end loan" financing were to operate as follows: When a prospect indicated his willingness to acquire a time-share unit, PIDL was to conduct a preliminary credit check on the prospective purchaser to determine whether the prospective purchaser could qualify for end-loan financing. If it appeared that the prospect did qualify, the prospect was re-

quested to sign a credit application, promissory note, mortgage, and truth-in-lending disclosure statements and to pay a deposit which was to be placed in an escrow account. The documents executed by the purchaser, including any credit reports received by PIDL, were forwarded to the Plaintiff, who would do its own credit check to determine whether the particular purchaser met its credit underwriting guidelines. If it was determined that the purchaser did qualify, the Plaintiff would purchase the promissory notes and mortgages from PIDL.

The record reveals that instead of purchasing each promissory note and mortgage individually, it was the custom of the Plaintiff and PIDL that PIDL would send the time share contracts in batches to the Plaintiff. Ordinarily, five to twenty time share contracts were included in the batch. The purchase was accomplished by the Plaintiff sending its check for as many notes and mortgages transmitted as it wished to purchase from the time contracts it received. The agreement with the Plaintiff required the PIDL to record the deed evidencing the sale of the time share contract, record the promissory note and mortgage executed by the purchaser directly to the Plaintiff. In addition, PIDL was required to obtain a release of the mortgage lien held by Guaranty on the particular timeshare units being acquired. After compliance with the foregoing, the Debtor as attorney was to issue a title policy insuring the mortgage lien of the Plaintiff to be first in priority on the particular time-share unit week.

Initially, the Debtor negotiated the end-loan financing with Guaranty. When Guaranty failed to proceed with the end loan financing, the Debtor eventually sought end-loan financing through the Plaintiff. It appears that on September 30, 1983, PIDL, through its principals, entered into a financing agreement with the Plaintiff, whereby Plaintiff agreed to supply the end loans financing for PIDL (Plaintiff's Exh. No. 3). As additional security for the financing, the Plaintiff requested and received the Debtor's personal guaranty (Plaintiff's Exh. No. 4).

The initial batch of time-share contracts was purchased by the Plaintiff on November 9, 1983. After this, the Plaintiff continued to purchase the time-share contracts from PIDL without incident.

It appears that PIDL, desirous of continuing developments, arranged for a construction loan to fund Phase II of the project with Concordia Federal (Concordia). The agreement with Concordia provided that Concordia would lend $7.5 million to PIDL to be secured by a mortgage on Phase II. The agreement further provided that Concordia would grant a release of its mortgage on the units in Phase II for payment to Concordia of one half of the sale price of a time-share week in Phase II. Sometime prior to the closing on the Phase II construction loan with Concordia, Concordia insisted as a condition precedent to closing that the release price on the remaining Phase I unit weeks be raised to a fixed amount, approximately two thirds of the sale price instead of the original amount of one half the release price.

Whether or not as a result of the raised release prices, it is undisputed that PIDL suffered a severe cash flow shortage in May 1984. In a summary prepared by PIDL, there is information that a majority of releases for Phase I were not obtained after May 1984 (Debtor's Exh. No. 2). Notwithstanding this cash crunch, it appears that the Debtor continued to send an attorney's certification letter containing his signature to the Plaintiff with each new batch of time-share contracts. As mentioned above, the letter promised the Plaintiff that the Debtor would obtain a release of the construction mortgage and would provide the Plaintiff with a title policy reflecting its mortgage as a first lien on the deed granted to the purchaser of the time-share unit week (Plaintiff's Exh. No. 5).

It appears that in October 1984, Concordia declared its loan with PIDL in default and instituted a foreclosure suit against PIDL. PIDL was placed in an involuntary Chapter 7 a month later. In order to protect its potential losses if the project was in fact foreclosed, Berkeley joint ventured the

project with Concordia by paying Concordia $3,400,000.00. It appears that on May 16, 1986, the Debtor filed his voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

As to the claim set forth in Count I of the Complaint, it is the Plaintiff's contention that by sending the certification letters with each batch when the Debtor allegedly knew the cash flow was insufficient to pay the release prices, the Debtor induced the Plaintiff to advance a million dollars to purchase end loans which were to be secured by first mortgages, which turned out to be the second mortgages because of PIDL's failure to obtain a release of the holder of the first mortgage. The Plaintiff further contends that the Debtor knew he would not be able to forward title policies because there were no funds available to pay for the construction loan releases. As a result of the Debtor's conduct, the Plaintiff contends that it holds approximately 331 mortgages on time-share contracts which are inferior and subordinate to the lien of Concordia and for which the Plaintiff has not received a title insurance policy. Based on the foregoing, it is the Plaintiff's contention that the Debtor obtained money from the Plaintiff by false pretenses and the debt should be declared nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

As to the claim in Count II, the Plaintiff alleges that the Debtor was appointed as escrow or closing agent by the Plaintiff, PIDL and the individual purchaser of the unit week. That as such agent, the Debtor agreed to obtain a promissory note and mortgage signed by the purchaser, promising to pay the finance price of the unit week. In addition, the purchaser was to obtain title to the unit week free and clear of the lien of the construction mortgage, and the Plaintiff was to receive a mortgagee title insurance policy insuring its lien as first. As a result of this appointment, the Plaintiff contends that the Debtor accepted the fiduciary relationship between himself and the parties, and the funds paid to him were to be placed in a separate account pending the accomplishment of the items set forth above. The Plaintiff alleges that

the Debtor in violation of his fiduciary responsibilities did not place the funds into a separate account and instead disbursed these funds to PIDL prior to disposition of his fiduciary obligations. Based on this, the Plaintiff asserts that any debt arising out of this conduct should be declared nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code.

The Plaintiff challenges the Debtor's right to discharge in Count III on the basis that, according to the Plaintiff, the Debtor concealed property of the estate by listing certain real estate on his B–2 Schedules as property held by him with his non-debtor wife and tenants by the entireties when in fact this was not true, and which also undervalued stock owned by the Debtor. The Plaintiff contends that this conduct is tantamount to making of a false oath and, therefore, the Debtor's discharge should be denied pursuant to § 727(a)(4) of the Bankruptcy Code.

Finally, in Count IV, the Plaintiff challenges the Debtor's right to a discharge pursuant to § 727(a)(4) of the Bankruptcy Code on the basis that the Debtor, in connection with his Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code committed false oath in that he, in fact, knew this was untrue and listed certain properties on his schedules as properties owned jointly with his wife as tenants by the entireties when he was the only record owner of these properties involved. In addition the Plaintiff alleges that the Debtor undervalued his shares of stock in Nature's Way, a resort park. Based on this, the Plaintiff contends that the Debtor, with the intent to hinder, delay and defraud his creditors, concealed these assets and hence, his discharge should be denied pursuant to § 727(a)(2) of the Bankruptcy Code.

■ Of course, the initial question is the Debtor's right to a general discharge since if the discharge is denied, the dischargeability of the debt, if there is one, would be rendered moot. The Debtor's right to discharge is challenged by the Plaintiff, who

relies on § 727(a)(2) and (a)(4), which provides as follows:

(a) ... the court shall grant the debtor a discharge, unless ...

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ... concealed ... or has permitted to be concealed

(A) property of the debtor within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; ....

Provisions dealing with the discharge have been traditionally recognized to be remedial and, as such, have always been liberally construed in favor of the debtor and against persons challenging the debtor's right to discharge of the Bankruptcy Code. *In re Burke*, 83 B.R. 716 (Bkrtcy.N.D.1988) Thus, it is well established that the burden is on the objecting party to prove that a debtor should be denied a discharge by way of clear and convincing evidence. *In re Bernstein*, 78 B.R. 619 (S.D.Fla.1987).

This Court is satisfied that the Plaintiff has failed to meet its burden of proof to show either that the Debtor intentionally made a false oath on his bankruptcy schedules or that the Debtor with the intent to defraud his creditors concealed any of his assets. The evidence presented indicates that the Debtor executed his schedules in blank and allowed his attorney to complete and file his schedules without further review. It is also undisputed that the Debtor did provide his attorney with the information necessary to prepare the schedules, and this may lead to the inference that the Debtor intentionally and knowingly provided his attorney with false information but that evidence, even in the best light, is in equilibrium with the evidence that the Debtor did not intentionally conceal assets or make a false oath, and, therefore, the Plaintiff has not proven his claims based on

§ 727(a)(2)(A) and (a)(4) by clear and convincing evidence. For this reason, these claims can not be sustained.

This leaves for consideration the claims which seek to except from the Debtor's discharge the alleged debt due to the Plaintiff from the Debtor pursuant to §§ 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.

11 U.S.C. § 523(a)(2)(A) and (a)(4) provide as follows:

(a) A discharge under section 523 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation other than a statement in writing respecting the debtor's or an insider's financial condition;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny; ...

The burden of proof to sustain a claim of nondischargeability based upon § 523 of the Bankruptcy Code is placed upon the party seeking to except the debt from discharge by clear and convincing evidence. *In re Hunter*, 780 F.2d 1577 (11th Cir. 1986).

■ Dealing first with the Plaintiff's claim in Count II, which seeks an exception to discharge under § 523(a)(4) based on the allegation that the Debtor was a fiduciary vis-a-vis the Plaintiff, this Court is satisfied that there was no evidence presented that any fiduciary relationship existed between the Debtor and the Plaintiff. There was no showing that the Debtor was the designated escrow agent for the parties which would arguably establish a fiduciary relationship pursuant to the express trust imposed on the funds in the escrow account under state law. Neither is there any showing that the Debtor as an attorney owed any fiduciary to the Plaintiff, vis-a-vis his status as an attorney. Further, the agreement entered into between the Plaintiff and Defendant did not provide that any monies extended by the Plaintiff would be

held in trust for the Plaintiff. The agreement, however, does provide that all remittances, monies or securities received by PIDL relating to the time-share contract shall be held in trust for the Plaintiff. This, however, at the most would create a fiduciary relationship between PIDL and the Plaintiff and certainly not such a relationship between the Plaintiff and the Debtor.

It should be noted at this juncture that in his Memorandum of Law submitted in connection with this proceeding, Plaintiff's counsel now argues that the alleged acts of the Debtor make out a claim of embezzlement, and under § 523(a)(4) should be declared nondischargeable, notwithstanding that this claim was never plead nor was a Motion made by Plaintiff to amend the pleadings to conform to the evidence pursuant to F.R.C.P. 15. Be that as it may, under F.R.C.P. 15(b) the failure of a party to move to amend the pleadings to conform to new evidence does not affect the result of the trial of the issues raised by the new evidence. Considering the new claim based on embezzlement, this Court is satisfied that there was no showing that the Debtor embezzled any of the monies received by the Plaintiff simply because the funds advanced by the Plaintiff to PIDL were loans financed to third parties which were no longer the properties of the Plaintiff.

The final claim of exception to discharge is based on § 523(a)(2)(A) of the Bankruptcy Code. In order for a Plaintiff to prevail under § 523(a)(2)(A), there must be a showing that (1) the debtor made the representation (2) at the time he knew they were false or knew that in the future he would lack the ability to live up to the statements (3) that he made the statements with the intent to deceive (4) that the creditor reasonably relied on the statement and (5) that the creditor sustained the alleged loss as a proximate result of the representations having been made. At the final evidentiary hearing, evidence was presented that showed that the Debtor was at meetings where discussions of the cash flow shortage took place and hence aware of the cash flow crunch which would definitely impact the ability to obtain the releases. This court is satisfied that the Debtor knew he did not have the ability to obtain the releases at the time he sent his attorney certifications letters to the Plaintiff. Therefore, the debt allegedly due to the Plaintiff should be declared nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

A comment should be made at this point to clarify the record in this adversary proceeding. It appears that on December 16, 1988, the Debtor filed a Motion to Strike Portions of Plaintiff's Brief, which argued that the debt should be declared nondischargeable pursuant to § 523(a)(6) for willful and malicious injury to property of the Plaintiff. The Court entered an Order on February 2, 1989, denying the Motion to Strike, but not setting forth the reasons for denial. The denial was based on the policy of this Court not to include briefs as part of the record in the proceeding and the Motion to Strike was actually denied as moot. Therefore, although denying the Motion to Strike references to § 523(a)(6), the Court did not consider any of the Plaintiff's arguments on this basis as it was not plead and no evidence was presented at the final evidentiary hearing to raise this claim and even if this Court entertains such a claim, it should be dismissed as a claim of willful malicious injury to property or conversion can not be maintained as it relates to monies.

Based on the foregoing, this Court is satisfied that the debt allegedly due and owing to the Plaintiff by the Debtor should be declared nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code. This Court is equally satisfied that the Plaintiff has failed to meet its burden of proof with respect to the remaining three claims set forth in the Complaint. Based on this, this Court is satisfied that the claims in Counts II, III and IV of the Complaint should be dismissed.

A separate Final Judgment will be entered in accordance with the foregoing.