**In re Mark G. FRAVEL, Gregory S. Button, et al.**

Bankruptcy Nos. 91–23302–B, 91–22944–B.

United States Bankruptcy Court, E.D. Virginia, Norfolk Division.

July 29, 1992.

judgment such that the total award to Trump Plaza will not exceed the original $200,000 debt.

John E. Bedi, Law Office of John E. Bedi, Virginia Beach, Va., for debtor.

Edward P. Nolde, Office of Atty. Gen., Richmond, Va., for plaintiff Com.

Debera F. Conlon, Office of U.S. Trustee, Norfolk, Va.

Jack D. Maness, Norfolk, Va., trustee.

## OPINION REGARDING DISCHARGEABILITY OF DEBT

HAL J. BONNEY, Jr., Bankruptcy Judge.

Was it widespread consumer fraud or was it merely the aggressive sell? The Commonwealth of Virginia challenges the discharge of certain alleged losses on the part of a group of consumer citizens who made purchases from Tri–Marketing Concepts, Inc. Tri–Marketing was owned and operated by the debtors here, Mark G. Fravel and Gregory S. Button.

What was the instrument of alchemy? Soap. Soap.

### Findings of Fact

Tri–Marketing Concepts, Inc., ("Tri–Marketing") was incorporated in Virginia on January 12, 1989, and operated its business out of two offices located in Richmond and Chesapeake, Virginia. Mark G. Fravel ("Debtor") was President, Treasurer, and a Director of Tri–Marketing, owning 51% of Tri–Marketing's only class of stock. Gregory S. Button ("Debtor, called collectively with Mark Fravel, Debtors") was Vice–President, Secretary, and a Director, and owned the remaining 49% of the stock. These two debtors were the sole officers and directors of Tri–Marketing.

The debtors were engaged in the business of packaging and selling household soap products to consumers who visited their showroom. The debtors contacted prospective buyers through the use of flyers that were sent to each person's home. The flyer contained the words "Final Notice" in bold letters in the upper right hand corner and an audit control number and final expiration date in the upper left hand corner. The flyer informed each consumer that "[they] had been recently notified by mail that [their] family had definitely been awarded—*at no cost and with absolutely no purchase necessary*—one of the following valuable items:

* GRANDFATHER CLOCK w/ German Movement

* VHS HQ STEREO VIDEO CASSETTE RECORDER with Remote Control

* 19″ STEREO T.V. with Remote Control

* AM/FM STEREO RECEIVER with Headphones

* HOME COMPUTER with Disc Drive & Monitor

* DELUXE MICROWAVE OVEN with Temperature Probe."

**INTERNAL AUDITING DEPARTMENT**
Award Distribution Center
7140 Midlothian Turnpike
Richmond, VA 23225
(804) 745-8333

AUDIT CONTROL NUMBER

## 265

FINAL EXPIRATION DATE

72 Hrs. from Receipt

# FINAL NOTICE

Good Morning:

You were recently notified by mail that your family had definitely been awarded - <u>at no cost and with absolutely no purchase necessary</u> - one of the following valuable items.

★ *GRANDFATHER CLOCK w/German Movement*

★ *VHS HQ STEREO VIDEO CASSETTE RECORDER*
   *with Remote Control*

★ *19" STEREO T.V. with Remote Control*

★ *AM/FM STEREO RECEIVER with Headphones*

★ *HOME COMPUTER with Disc Drive & Monitor*

★ *DELUXE MICROWAVE OVEN with Temperature Probe*

Please be advised that our company policy will no longer allow us to reserve this item unless you respond immediately to this FINAL NOTICE. Failure to respond within 72 hours will void this offer and release your premium to someone else.

Your specific item will be determined by matching your Audit Control Number to the Premium List, available in all locations. <u>You must call within 72 hours of Receipt Date to reserve your item.</u>

**RICHMOND, VA**            **CHESAPEAKE, VA**
(804) 745-8333            (804) 436-3332

Call Weekdays 9 a.m. to 8:30 p.m. - Saturdays 9:30 a.m. to 2:30 p.m.

Lucky Seal Prizes awarded through the courtesy of Tri Marketing Concepts, Inc. and cooperating sponsors. These items are being awarded to participating families as part of a courtesy advertising promotion. Participants must be over 21, married, credit-worthy and presently employed full time. Prizes may be redeemed by all participating families with no purchase necessary. Participants must meet eligibility requirements. Previous participants are not eligible. Non-transferable.

---

Prospective customers who responded to the flyer by visiting a sales office of Tri-Marketing were given quite a lengthy sales presentation by one of the company's sales representatives. This involved leafing through a sales book, completing a questionnaire, a demonstration, questions to prospective purchasers ... and talk, lots of talk. However, was the talk the usual "puffing" or was it the beginning of the primrose path? The session, by the way, could be monitored by a hidden microphone. The debtors themselves monitored several sales presentations a week.

Then, suddenly, the ritual moved to a showroom which was filled with approximately 40 to 50 different kinds of products, including television sets, video cassette recorders, grandfather clocks, washers, and

driers. The sales representatives explained that under the Tri–Marketing program consumers could use the money that they would have "saved" on cleaning products had they shopped in the grocery store and spend it on one or more of the appliances and household products located on the showroom floor. Each product on the showroom floor had a sticker placed on it with a number ranging from one-half to four. The sales representatives told the consumers to choose items from the showroom floor that they would like to have, totalling four points. While the consumers were selecting products, the sales representatives demonstrated various types of merchandise that the consumers had selected.

There is a sudden switch, the record one. First, it was "come in and claim your prize," but "we do have some soap products to sell." Then, "we have appliances for sale, too." What was the cost of a package deal? $2,990. During the time Tri–Marketing was in business, the company entered into approximately 750 contracts with consumers at a cost of $2,990 each, exclusive of interest. In 1989 Tri–Marketing's sales totalled $1,952,701.00. During the several months Tri–Marketing was in business in 1990, the company's sales totalled $873,756.00.

*Significantly, if a purchase was made, the written agreement included the appliances, never the soap products.*

In our analysis it is well to keep in mind the three steps of the relationship:

(1) the flyer offering a premium to come in,

(2) the hard soap sell, and

(3) the inclusion of appliances in the package.

We have examined the flyer; it speaks for itself.

The soap products ranged from hair shampoo to laundry detergent. The products were purchased by Tri–Marketing from a manufacturer, Avril, and others, and were a concentration of natural and synthetic ingredients. The cost to Tri–Marketing was $175 per kit. (The same basic products were sold by the manufacturer to institutions, such as hospitals.) Prospective consumers were told the products were "(1) completely safe, (2) all biodegradable, (3) non-polluting, (4) made to comply with federal regulations, [and] (5) made from the finest of active ingredients."

The complaints with the soap products began to develop. Eventually, the Division of Consumer Affairs of the Commonwealth of Virginia received 38 complaints from consumers.[1] Tri–Marketing had received 6 to 8 complaints from the Better Business Bureau.

Several purchasers of the soap products from Tri–Marketing testified at trial and this testimony was generally cumulative. The chief complaints were (1) the products did not work and (2) harmful results were obtained such as itching, scabs and rashes. Washed clothes were gray, spotted and unclean. Too, consumers were told the products would last 7 years. While in the end it became difficult to reach Tri–Marketing, the Court would have to conclude that an honest effort was made to replenish the products upon request. Even the manufacturer did this after Tri–Marketing folded.

Nearly a half of the trial was devoted by the parties to the issue of the quality of the products. A waste to beat this issue so badly! On and on the testimony went comparing Tri–Marketing products to name brands. This might do well in a products liability suit, but, remember, this is bankruptcy. While the products did not work for some, others wrote of their satisfaction. There is no evidence the manufacturers were putting out, deliberately, inferior or harmful products. What court in the land can conclude these products were better or worse than, say, BOLD? And reasonable efforts were made to resolve complaints.

No grounds have been shown by a preponderance of the evidence that the soap products were materially misrepresented. Puffed—indeed! However, whether these

---

**1.** The Virginia Attorney General's office began to investigate Tri–Marketing in October 1989 and in April of 1990, it, Tri–Marketing ceased to do business due to financial difficulties.

products were a device in a larger scheme is yet to be addressed.

Let us now pause and summarize our findings based upon the evidence:

(1) Prospects are enticed in by Tri–Marketing with the offer of a free gift. In most instances the gift was a headphones receiver costing Tri–Marketing $6 to $6.50. There was testimony of the receivers' poor quality and quick failure. Too, the gift was not given until the sales pitch was given.

(2) Clearly, recipients of the flyers were told nothing about soap products and appliances. Consumers went to Tri–Marketing with no intent of buying.

(3) The soap products kit costs Tri–Marketing $175. A consumer must purchase a deal, a package, for $2,990, consisting of a kit and usually a single major appliance. Additional appliances could be purchased. The appliance is represented as a gift, a premium, for the "savings" of the Tri–Marketing products over name brands.

(4) If a contract was signed and financed, the agreement recited the appliance, but not the soap products. That the finance company, Security Pacific Financial Services, "requested" this omission does not excuse Tri–Marketing. It was dishonest to omit the complete picture and Tri–Marketing controlled all events and procedures.

(5) There have been significant complaints on the part of consumers. Thirty-eight complaints to the state out of 750 sales is significant and to that must be added those to the Better Business Bureau and to Tri–Marketing itself. One who worked briefly for the company, John Sonney, testified there were on an occasion protestors outside of the building. And, too, many never complain; they absorb it.

(6) False representations were made as to the Company's standing in the community. Membership was represented in the "Consumerism Bureau," the Metro Chamber of Commerce and the Better Business Bureau. None of this was true relative to the Richmond, Virginia, operation and only a provisional Better Business Bureau membership existed in Chesapeake. It was a member of the United States Chamber of Commerce.

(7) The debtors here, Mark Fravel and Gregory Button, were Tri–Marketing. They were the owners, directors and officers; they dealt with manufacturers; they trained sales personnel; they monitored sales pitches; they decided who would receive premium gifts; and they managed the operations.

On May 20, 1991, Gregory S. Button filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Virginia. Several days later, on June 6, 1991, Mark G. Fravel filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the same Court.

On August 19, 1991, the Commonwealth of Virginia, through the Attorney–General, filed a complaint to determine dischargeability of debt against Button. Thereafter, on September 9, 1991, the Attorney–General filed a similar complaint against Mark Fravel. In response, Button filed a motion to dismiss the nondischargeability complaint. Fravel also filed a motion to dismiss the nondischargeability complaint. In addition, the Attorney–General filed a motion to consolidate adversary proceedings in which she asked the Court to combine defendant Button's adversary proceeding with that of Mark Fravel's.

On November 5, 1991, the Court denied the motion to dismiss and ordered that both cases be jointly administered. The Court also ordered the Attorney–General to file an amended complaint. The Attorney–General filed an amended complaint to determine dischargeability of debts on November 14, 1991. The Attorney–General brought the complaint for and on behalf of the people of the Commonwealth for the purpose of determining whether an alleged debt purported to have been incurred through unlawful, deceptive, and fraudulent practices and acts should be declared dischargeable in the debtors' bankruptcies. The Attorney–General alleged that in the course of their business operations the

debtors and their company violated the Virginia Prizes and Gifts Act, §§ 59.1–415 *et seq.* of the code of Virginia, and the Virginia Consumer Protection Act of 1977, §§ 59.1–196 *et seq.* of the Code of Virginia. The Attorney–General also alleged that pursuant to 11 U.S.C. § 523(a)(2)(A) the alleged debt is not dischargeable because the debtors incurred the debt through false pretenses, false representations, or actual fraud.

The Attorney–General sought to permanently enjoin the debtors from failing to give potential consumers unconditional prizes or gifts which the debtors represented they would award; using any deception, fraud, false pretenses, false promises or misrepresentations while dealing with the consumers; and from misrepresenting the quantities, characteristics and ingredients of goods used in their presentation. The Attorney–General also requested civil penalties in the amount of $1,000 for each willful violation of the Prizes and Gifts Act or the Virginia Consumer Protection Act of 1977, costs and a judgment equal to all individual claims for damages or any other order to repay identifiable claimants their damages.

More specifically, the Attorney–General claimed that the debtors through their business practices had violated the Virginia Consumer Protection Act of 1977 in numerous ways including the following:

awarding to at least ninety-nine percent of consumers who responded to the promotional flyer an inexpensive AM/FM portable radio; stating on the flyer that the potential customer had been recently notified of an award; representing that Tri–Marketing had been in business for over thirty years; representing that the cleaning products were hypo-allergenic, suitable for consumers with allergies, or of a nature to not cause an allergic reaction; representing that the cleaning supplies are environmentally safe; representing that Tri–Marketing was a member of the "Consumerism Bureau"; representing to consumers that the electronic products were prizes or gifts awarded to consumers in consideration of purchasing a seven year supply of the debtors'

cleaning supplies; representing that the cleaning products were superior to and more concentrated than national brand household cleaning products; representing that national brands, such as Tide or Bold, contained orange rinds or peanut hulls as fillers; and representing that the debtors' cleaning supplies would last each consumer for a period of seven years. See amended complaint filed on November 14, 1991.

On December 12, 1991, the Court entered an order granting Mark Fravel relief to convert his bankruptcy petition to a case under Chapter 7 of Title 11 of the Bankruptcy Code.

Pursuant to a motion for summary judgment filed by the defendants, the Court entered an order on January 24, 1992, which stated that "the Commonwealth of Virginia, through the Attorney–General of Virginia, has standing to represent the interests of individual consumers in [the above case], to establish liability, and to determine the nondischargeability thereof, of the defendants to said consumers for fraud in violation of the Virginia Consumer Protection Act of 1977 ("the Act"), Virginia Code § 59.1–196." The Court further ordered that the Commonwealth need not identify each consumer harmed, but may proceed on behalf of the class of purchasers who allegedly suffered damage, and that "the Commonwealth is a unique plaintiff with law-enforcement interests such that the Commonwealth need not comply with the requirements for class actions under Fed.R.Civ.P. 23." Also, the Court ordered that the Commonwealth may seek an award of civil penalties against the defendants in the adversary proceeding on nondischargeability, but must use the state court system to seek injunctive relief to prevent the defendants from committing violations of the act in the future.

A trial on the merits was held in the case at bar on March 26, 1992, and was concluded on April 30, 1992. A time of briefing followed.

We now address the law where further findings of facts will be woven in and/or summarized where illustrative.

*Conclusions of Law With Further Findings of Facts*

The Attorney–General seeks to have this Court find that the debtors have committed violations of the Virginia Prizes and Gifts Act, §§ 59.1–415 *et seq.* of the Code of Virginia and the Virginia Consumer Protection Act of 1977, §§ 59.1–196 *et seq.* of the Code of Virginia thereby incurring liability to the consumers who purchased their soap products and that this indebtedness be declared nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(A). Section 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

11 U.S.C. § 523(a)(2)(A).

■ The Court has previously held that in order to have a debt determined nondischargeable pursuant to § 523(a)(2)(A), a plaintiff must show that the debtor:

(1) made the representation(s),

(2) knowing at the time the representation(s) was made that it was false,

(3) made the representation with the intent and purpose of deceiving;

(4) the plaintiff relied on the representation(s), and

(5) the plaintiff suffered loss and damage as a result of the representation having been made.

*In re Pitt,* 121 B.R. 493, 495 (Bankr. E.D.Va.1990), citing *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va. 1967). Therefore, in this case, the plaintiff must prove by a preponderance of the evidence that the debtors (1) made representations or used false pretenses in selling their soap products, (2) were aware that the representations and methods of sale concerning their soap products were false at the time, (3) intentionally deceived the consum-

ers concerning the soap products, (4) the consumers relied on the debtors' misrepresentations in purchasing the soap products, and (5) as a result of the reliance the consumers have suffered a loss and damages.

■ It should be noted at the outset that the Court is of the belief that the Tri-Marketing sales representatives were acting as agents for the debtors so that any representations made by the sales representatives are attributable to the debtors just as if they had made the representations themselves. "In determining whether a person is the agent of another, it is necessary that he not only be subject to the latter's control or right of control, with regard to the work to be done and the manner of performing it, but the work has to be done on the business of the principal or for his benefit. Actual control, however, is not the test; it is the right to control which is determinative." *Whitfield v. Whittaker Memorial Hospital,* 210 Va. 176, 169 S.E.2d 563, 567 (1969); *Allen v. Lindstrom,* 237 Va. 489, 379 S.E.2d 450, *cert. denied,* 493 U.S. 849, 110 S.Ct. 145, 107 L.Ed.2d 104 (Va.1989). ("The power of control is the determining factor in ascertaining the alleged agent's status"). "[As a general rule], a principal is bound by representations of his agent, made either in the scope of his employment or in furtherance of the object for which he is employed." *Nationwide Ins. Co. v. Patterson,* 229 Va. 627, 630, 331 S.E.2d 490, 493 (1985); *Pownall v. Cearfoss,* 129 W.Va. 487, 40 S.E.2d 886, 893 (1946). ("[T]he agent represents the principal and acts in his behalf with authority to bind him in a transaction with a third party"); *Georgiades v. Biggs,* 197 Va. 630, 90 S.E.2d 850, 854 (1956). (The principal cannot repudiate their agent's statements and are bound by his material representations of fact).

■ In order to satisfy the first two elements of fraud, the plaintiff must show that the debtors made representations which they knew were false when they made them. In this instance, the representation made by the debtor must be "one of existing fact and not an expression of opinion." *In re Criswell,* 52 B.R. 184 (Bankr.

E.D.Va.1985). "A false representation does not include a mere promise to be executed in the future, even though the promise is subsequently breached." *In re Zack,* 99 B.R. 717, 722 (Bankr.E.D.Va. 1989). "Neither representations of fact that will exist in the future nor mere promises, although false and intended to deceive, afford the basis of actionable fraud." *Id.* Additionally, "reckless disregard for the truth or falsity of a statement [also] constitutes a false representation under § 523(a)(2)(A)." *In re Moran,* 120 B.R. 379, 390 (Bankr.W.D.Va.1990).

While separate elements under 11 U.S.C. § 523(a)(2), and proving all or any is sufficient for finding debts nondischargeable in bankruptcy, the false representations and the false pretenses here flow together.

The Court finds the entire enterprise was one of *false pretenses.* The public was led to believe, through the flyer, that a free gift was theirs. While the gift was eventually given, the people had to endure a lengthy hard-sell. Soap products were tied in with appliances. Was theirs a program to sell soap or appliances? This uncertainty is clearly false pretenses. There is a lure, bait, and a switch, a double switch from gift to soap to appliances.

The Court finds that the evidence shows, again by a preponderance, that the debtors made numerous *false representations.* The debtors contacted prospective consumers through a promotional flyer that advised the consumers that they had been recently notified that they had been awarded one of several items when in fact, the consumers had not been previously contacted and the flyer was actually the first and only notice to the consumers. The flyer further indicated to the consumers that they would receive one of six "valuable" items listed on the flyer; however, the evidence indicated that the debtors regularly gave the consumers an inexpensive AM/FM stereo receiver and only in rare instances did the debtors award a consumer one of the more valuable items.

In addition to the misstatements in the flyer, the debtors also misrepresented the number of years they had been in business.

The evidence showed that the debtors informed the consumers that they had been in business for "many, many years" when in fact the debtors had been in business less than two years. The debtors also led the consumers to believe that Tri–Marketing was a member of the "Consumerism Bureau." However, the evidence revealed that there is no governmental consumer protection agency in central Virginia with the name "Consumerism Bureau." Additionally, the debtors represented that Tri–Marketing was a member of the Better Business Bureau. The evidence also showed, however, that Tri–Marketing was not a member of the Better Business Bureau in Central Virginia where the Richmond office was located, and the Chesapeake office was only a provisional member which indicated that the company had been in business for less than one year.

The debtors also made several other misrepresentations during their sales presentations. These included representations that the cleaning supplies were environmentally safe and biodegradable, when in fact, the debtors did not have any proof of these facts. As a part of their sales presentations, the debtors performed a misleading demonstration using unequal amounts of detergent in several glasses of water. The debtors implied that soap dissolves in water and claimed that the residue in the glasses containing the national brands was fillers such as sawdust, sand, orange peels, and peanut shells. The debtors had no basis for making these representations other than what they had read in an encyclopedia about the evolution of soap making. In fact, the debtors were contacted by a national brand manufacturer of detergents regarding possible false representations made by the debtors, including among other things, that their products contain orange peels and peanut hulls. However, several days after the debtors received the letter from the national brand company, the sales representative continued to make these representations.

The debtors also represented that the electronic products and appliances on the showroom floor were *prizes* or *gifts* award-

ed to the consumers for purchasing the cleaning supplies. This was a clear lie. The evidence showed that these durable goods were not being awarded as gifts or prizes, but in fact were being sold and used as security for the promissory notes the consumers were signing. One consumer testified that it was his understanding that he was purchasing the cleaning products and that the above items were given to him as a result of buying the cleaning products. An additional consumer testified that she received a microwave and a computer at the same time she purchased the soap, but that she believed the microwave and computer were given to her as an "incentive gift." In addition, several consumer witnesses also testified that they had not gone to Tri–Marketing's business to purchase the durable goods, but that their purpose of going to the office was to look at cleaning products. The debtors were fully aware that they were not giving the consumer the durable goods as gifts, but continued to lead the consumers to believe that these items were free.

The Court is cognizant of the case law indicating that facts or promises to be executed in the future, even though false and intended to deceive, cannot be a basis for fraud. However, the Court is also aware of an exception to the general rule in the case of a seller who had actual or purported expertise in a particular field. "Where the parties are on unequal terms even an opinion can be actionable [in fraud]." *Nationwide Ins. Co.*, 229 Va. at 631, 331 S.E.2d at 493. (Insurance agent presumed to have information not equally available to layman so that agent's opinion is treated as fact and is actionable in fraud). In addition, as the court in *Ward Development Co. v. Ingrao*, 63 Md.App. 645, 493 A.2d 421 (1985), indicated, "[there is a] difference between a promise of future events and an estimate by one knowledgeable in a particular field. In the latter situation redress may be had for representations as to future facts and not merely as to past or existing facts." *Id.* 493 A.2d at 427; *See also In re Welden*, 98 B.R. 590, 595 (Bankr. M.D.Fla.1989). (Debtor's awareness of ina-

bility to perform in the future constitutes basis for fraud).

Accordingly, the Court is of the belief that the debtors in the case at hand held themselves out to be knowledgeable in the field of soap products. The debtors informed the consumers that they had been in the business of selling soap for "many, many years," and that Tri–Marketing had designed and formulated "the Ultimate Answer ... the Cleaning System." The debtors also demonstrated their knowledge of soap products by performing a demonstration using three glasses of water filled with laundry detergent and informing the consumers that the residue in the glasses containing national brands was fillers such as sand, sawdust, orange peels and peanut shells. The debtors also led the consumers to believe that they had an enhanced knowledge about the chemical make-up of the cleaners. The debtors informed the consumers that each brand of cleaner contains the same cleaning chemical and that the only difference between each brand is the fillers or perfumes in the product and that each product cleaned about the same. Therefore, the Court holds that the debtors led the consumers to believe that they had a special knowledge about the soap products and that the consumers were entitled to rely on the opinions or promises of the debtors concerning the soap supplies. During the course of their presentations, the debtors made several statements of opinion or promises to be performed in the future. Since the debtors held themselves out to be knowledgeable in the soap field, these opinions or promises constitute statements of fact and are actionable as fraud.

First, the debtors informed each consumer as to how many years the supply of soap products would last them. The debtors had no reasonable basis for this opinion other than the average number of loads of wash the consumer did during a week. The debtors made no calculations regarding any of the other various types of soap products contained in the package, but relied solely on the number of loads of wash done each week. The debtors also represented to the consumers that the soap prod-

ucts were "hypoallergenic" and that the consumers should not experience an allergic reaction to the products since the soaps did not contain perfume or fillers as that of the national brands. The evidence showed that the debtors did not have a reasonable basis for this opinion and, in fact, several consumer witnesses testified that they did experience allergic reactions to the soap products. Further, the debtors opined that the Tri–Marketing product was "the most highly concentrated, totally active cleaning products ever formulated." However, the evidence showed that the debtors did not formulate the products themselves, but that they purchased the soap from manufacturers and had their private label placed on the containers. The evidence also showed that the debtors switched suppliers twice, but that they continued to make the representation after each switch that their product was the most highly concentrated and totally active cleaning products formulated.

As can be seen from the above facts, the debtors made numerous representations that they knew were false when they made them to the consumers. Further, the Court is of the opinion that the debtors at the very least showed a reckless disregard for the truth or falsity of the representations which is also sufficient to constitute a false representation under § 523(a)(2)(A).

The third element the plaintiff must prove in order to show fraud is that the debtors made the above misrepresentations with the intent and purpose of deceiving the consumers. "As to proving intent to deceive, courts have recognized that direct proof of fraudulent intent is almost impossible to produce. Therefore, a trial judge may *infer* an intent to deceive from an examination of the totality of the circumstances or facts placed into evidence." *In re Wyatt*, 87 B.R. 874, 878 (Bankr.E.D.Va. 1988). In addition, "there must exist at the time, *from the very onset*, an intent to deceive. The intent may not follow the representation. In the parlance on the street, one must scheme from the inception to *take* the creditors." *In re Koushel*, 11 B.R. 836, 840 (Bankr.E.D.Va.1981). As the

court in *Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) stated:

> Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *See In re Simpson*, 29 B.R. 202, 211 (Bankr.N.D.Ia.1983). *Accord In re Frye*, 48 B.R. 422, 427 (Bankr.M.D.Ala. 1985); *In re Brown*, 55 B.R. 999, 1004 (Bankr.E.D.N.Y.1986). When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor "cannot overcome [that] inference with an unsupported assertion of honest intent." *In re Simpson*, 29 B.R. at 211–12. The focus is, then, on whether the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor." *In re Hunt*, 30 B.R. 425, 441 (M.D.Tenn.1983).

Additionally, "where ... a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to [rely on it], intent to deceive may logically be inferred." *Carini v. Matera*, 592 F.2d 378, 379 (7th Cir.1979). *See also In re Smith*, 25 B.R. 396, 398 (Bankr.D.Md.1982). (Intent to deceive may be inferred from a knowing or reckless representation). In accordance, the 11th Circuit has held that " 'reckless disregard for truth or falsity of a statement constitutes a 'false representation' under section 523(a)(2)(A).' " *Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985), *quoted in In re Zack*, 99 B.R. at 722, n. 7. However, according to Bankruptcy Courts in Virginia, "the recklessness must exceed negligence and rise to the level of reckless disregard for truth. Such recklessness usually is determined by a pattern of conduct." *In re Zack*, 99 B.R. at 722, n. 7; *See also In re Moran*, 120 B.R. at 390.

Based on the evidence adduced at trial, the Court is of the opinion that the debtors had formulated a scheme whereby they would entice innocent consumers to come to their place of business on the promise of receiving a free gift for listening to a soap

presentation. Throughout their misleading presentation the debtors further planned to lead the consumers into believing that they could receive additional items at no extra cost. The Court is also of the opinion that the debtors had the intent to deceive the consumers from the onset and at the time the representations were made. The evidence showed that the debtors knew that the sales book was replete with misrepresentations and that they did not have a basis for making many of the representations that they made during the sales presentation. In the unlikely event the debtors did not knowingly make the false representations, the Court is also of the belief that the debtors at the very least made the representations with reckless disregard for the truth or falsity of the statements and that this recklessness exceeded negligence. Even if the testimony that the debtors copied their sales book and pitch from a company in Florida was true, the debtors nonetheless were reckless in not ascertaining the truth of the statements contained in the sales book and the demonstrations that were used.

The last two elements that the plaintiff must show in order to prove fraud is that the plaintiff relied on the misrepresentations thereby suffering a loss and damages as a result of the reliance. "[T]he action of the debtor [must have been] the act, without which the claimant would not have suffered the loss complained of." *In re Zack,* 99 B.R. at 722; *See also In re Preston,* 47 B.R. 354, 357 (E.D.Va.1983). ("Reliance on statement must be to the prejudice of creditor."); *Sweet v. Ritter Fin.,* 263 F.Supp. at 543 ("[T]he alleged loss and damages [must be] the proximate result of the representation having been made.").

In the case at hand, the Court is of the opinion that the consumers relied on the numerous misrepresentations made by the debtors during the sales presentation in purchasing the soap products and that as a consequence of their reliance the consumers have been damaged. The evidence showed that the consumers who listened to the sales presentation were told that "Tri–Marketing Concepts had built its business on honesty, product reliability, high tech-

nology, fine product guarantee, excellent local service and honest product demonstrations" and that they were receiving "the most highly concentrated, totally active cleaning products ever formulated." In addition, the consumers were informed that as for quality Tri–Marketing's product is "completely safe," "biodegradable," "non-polluting," "made to comply with federal regulations," and "made from the finest active ingredients."

Relying on the above misrepresentations, as well as the misrepresentations previously listed, approximately 750 consumers entered into a contract with Tri–Marketing to buy their soap products. However, over a period of about three years approximately 44 consumers were dissatisfied enough with the quality of Tri–Marketing's product to lodge a complaint with the Better Business Bureau or the Division of Consumer Affairs of the State of Virginia. In addition, several consumer witnesses testified that Tri–Marketing's soap products had harmed their skin. Two consumers suffered skin irritations from using the shampoo while another consumer suffered skin irritations from using the body soap. Another consumer testified that the sink cleaner turned her hands red and blistery.

In addition to causing adverse physical reactions, the soap products also failed to clean as well as other national brands. One consumer testified that the laundry detergent turned his family's clothes "gray and splotchy" and that the white clothes would not return to their white color and were ruined. A second consumer testified that the laundry detergent left yellow spots on the clothes and failed to clean them. A third consumer testified that she ceased using the products because the products were not cleaning her dishes, clothes or her car. An additional consumer stated that the dishwashing detergent left a "dark stainy hard film" on the dishes and silverware and that the glasses were "spotty and cloudy" and were covered with a "crusty film."

As previously noted, the Court is of the opinion that the sales presentation concocted by the debtors is replete with false

representations and false pretenses. Additionally, the Court believes that the debtors' false representations and false pretenses amounted to actual fraud. "The law is settled that a false representation pursuant to 11 U.S.C. § 523(a)(2)(A) must be of a kind involving moral turpitude or intentional wrong." *In re Holt*, 24 B.R. 696, 698 (Bankr.E.D.Va.1982). *See In re Pappas*, 107 B.R. 95, 98 (Bankr.W.D.Va. 1989). (" 'Actual' fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another of something said, done or omitted with design of perpetrating what is known to be a cheat or deception."). Furthermore, "[a] debt is declared nondischargeable pursuant to this section only if the debtor has engaged in actual fraud as opposed to fraud implied in law or constructive fraud." *Id. See In re Preston*, 47 B.R. at 357. "Fraud cannot be demonstrated by circumstances which permit reasonable inferences of nonfraudulent conduct." *In re Pappas*, 107 B.R. at 98, quoting *Matter of Homer*, 45 B.R. 15, 22 (Bankr.W.D.Mo.1984).

As the facts have shown, the debtors intentionally developed a scheme whereby they would deceive unsuspecting consumers into purchasing $2,990 worth of something. In this case, fraud has been clearly shown and there are no circumstances which would permit a reasonable person to infer that the conduct of the debtors was nonfraudulent.

■ The Court is also of the opinion that there is sufficient evidence in the case before it for the Attorney–General to properly pierce the corporate veil that might shield the debtors from liability of the Tri–Marketing corporation. The Court recognizes that a "corporation is an entity, separate and distinct from its officers and stockholders, and that its debts are not the individual indebtedness of its stockholders." *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir.1976). However, the Court also believes that "this concept of separate entity is merely a legal theory, 'introduced for

purposes of convenience and to subserve the ends of justice,' and the courts 'decline to recognize [it] whenever recognition of the corporate form would extend the principle of incorporation "beyond its legitimate purposes and [would] produce injustices or inequitable consequences." ' " *Id.* Therefore, " 'in an appropriate case and in furtherance of the ends of justice,' the corporate veil will be pierced and the corporation and its stockholders 'will be treated as identical.' " *Id.*

The Court is of the belief that the corporate veil of the debtors can be pierced on the basis of fraud. "Fraud can be the basis for disregarding the principal of limited liability which is the hallmark of the corporate entity." *In re Moran*, 120 B.R. 379, 387 (Bankr.W.D.Va.1990). In the case of *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944), the United States Supreme Court held:

> Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted. But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied. Mr. Justice Cardozo stated that a surrender of that principal of limited liability would be made 'when the sacrifice is essential to the end that some accepted public policy may be defended or upheld.' Citations omitted. The cases of fraud make up part of that exception. Citations omitted.

*Quoted in In re Moran*, 120 B.R. at 387. Thus, the Court is of the opinion that based on the fraudulent conduct previously discussed, there is sufficient evidence that the debtors defrauded the consumers in obtaining money for the corporation. Therefore, since all elements of § 523(a)(2)(A) have been proven by a preponderance of the evidence, the corporate veil can be pierced rendering the debtors liable for the corporate debts.

■ The Commonwealth of Virginia has alleged in its amended complaint that the debtors have incurred the underlying liability because of their violations of the Virgi-

nia Prizes and Gifts Act, §§ 59.1–415 *et seq.* of the Code of Virginia, and under the Virginia Consumer Protection Act of 1977, §§ 59.1–196 *et seq.* of the Code of Virginia. While what has been found and concluded alone is sufficient to find the debts nondischargeable, clear violation of the state statutes is sufficient on its own to likewise find the debts nondischargeable. According to § 59.1–422 of the Virginia Prizes and Gifts Act, "[a]ny violation of [the Virginia Prizes and Gifts Act] shall constitute a prohibited practice under the provisions of § 59.1–200 [of the Virginia Consumer Protection Act] and shall be subject to any of the enforcement provisions of [the Virginia Consumer Protection Act]."

VIRGINIA PRIZES AND GIFTS ACT

Pertinent sections of the Virginia Prizes and Gifts Act are as follows:

Section 59.1–416. Representation of having won a prize, gift or any item of value.—A. No person shall, in connection with the sale or lease or solicitation for the sale or lease of goods, property, or service, represent that another person has won anything of value or is the winner of a contest, unless all of the following conditions are met:

1. The recipient of the prize, gift or item of value shall be given the prize, gift or item of value without obligation; and

2. The prize, gift or item of value shall be delivered to the recipient at no expense to him, within ten days of the representation.

B. The use of language that may lead a reasonable person to believe he has won a contest or anything of value, including, but not limited to, "Congratulations," or "You have won," or "You are the winner of," shall be considered a representation of the type governed by this section.

Section 59.1–417 [in pertinent part]. Representation of eligibility to win or to receive a prize, gift or item of value.—A. No person shall, in connection with the sale or lease or solicitation for sale or lease of goods, property or service, rep-

resent that another person has a chance to win or to receive a prize, gift or item of value without clearly and conspicuously disclosing on whose behalf the contest or promotion is conducted, as well as all material conditions which a participant must satisfy. In an oral solicitation all material conditions shall be disclosed prior to requesting the consumer to enter into the sale or lease. Additionally, in any written material covered by this section, each of the following shall be clearly and prominently disclosed (i) immediately adjacent to the first identification of the prize, gift or item of value to which it relates or (ii) in a separate section entitled "Consumer Disclosure" which title shall be printed in no less than ten-point bold face type and which section shall contain only a description of the prize, gift or item of value and the disclosures outlined in subdivisions 1, 2 and 3 of this subsection:

1. The actual retail value of each item or prize, which for purposes of this section shall be (i) the price at which substantial sales of the item were made in the area in which the offer was received within the last ninety days or (ii) the actual cost of the item of value, gift or prize to the person on whose behalf the contest or promotion is conducted plus no more than 700 percent, but in no case shall it exceed such person's good faith estimate of the appraised value;

2. The actual number of each item, gift or prize to be awarded; and

3. The odds of receiving each item, gift or prize ...

D. The provisions of this section shall not apply where to be eligible:

2. Participants are never required to listen to a sales presentation and never requested or required to pay any sum of money for any merchandise, service or item of value.

In the case at bar the debtors notified the prospective consumers that "[they] were recently notified by mail that [their] family had definitely been awarded—at no cost and with absolutely no purchase neces-

sary—one of the following valuable items." According to § 59.1–416(A)(1), the debtors were required to give the gifts to the prospective consumers without obligation. However, the facts in this case show that the prospective consumers were never informed prior to coming to Tri–Marketing about soap products and appliances and were required to sit through a lengthy sales presentation before they were given their free gift.

The debtors also violated § 59.1–417(A) which requires a person who represents that a person has a chance to receive a free gift to "clearly and conspicuously" reveal to the individual on whose behalf the promotion benefits, as well as all material conditions the individual must meet in order to receive the free gift. Additionally, if the solicitation is oral, all material conditions must be disclosed before the consumer is requested to enter into a sale.

In the present case, the debtors did not disclose all material conditions which a prospective consumer must satisfy in order to obtain the gifts. Several consumers testified that the debtors represented to them that they were to be awarded additional electronic products as a bonus for purchasing the soap products. However, the consumers were actually purchasing the additional products which were being used to secure the promissory notes entered into by the consumers.

Additionally, there is testimony in the case at bar that sales representatives used worksheets to list the extra items that the consumers had chosen and to write the estimated value of the items. According to § 59.1–417(A), written material pertaining to the gifts must disclose specific material, including the actual retail value of the item or prize. However, the actual value of the gifts were not disclosed on the worksheets but, rather, the consumers were led to believe the cost of the items were as the consumers had estimated. The sales representatives wrote down the price the consumers had estimated and made no effort to change the price to the actual value or make the consumers aware that their estimation was incorrect.

An additional section of the Virginia Prizes and Gifts Act, § 59.1–421, provides that "[a]ny consumer who suffers loss by reason of a violation of any provision of this chapter may bring a civil action to enforce such provisions." Further, "[a]ny consumer who is successful in such an action shall recover reasonable attorney's fees, and court costs incurred by bringing such action."

## VIRGINIA CONSUMER PROTECTION ACT

Section 59.1–200 of the Virginia Consumer Protection Act lists numerous acts or practices which are considered fraudulent if committed by a supplier in connection with a consumer transaction. A "supplier" is defined in § 59.1–198 to mean "a seller or lessor who advertises, solicits or engages in consumer transactions, or a manufacturer or distributor who advertises and sells or leases goods or services to be resold or leased by other persons in consumer transactions." According to this definition, the debtors would be considered suppliers since they advertised, solicited and engaged consumers to enter into transactions involving the purchase of soap. The fraudulent acts listed by § 59.1–200 which are pertinent to the case at bar are as follows:

2. Misrepresenting the source, sponsorship, approval, or certification of goods or services;

5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction;

22. Violating any provision of the Prizes and Gifts Act, Chapter 31 (section 59.1–415 *et seq.*) of this title.

As discussed in the facts of this case, the debtors committed numerous violations of this section. Among the false representations shown, the debtors misrepresented

their membership in several bureaus, as well as the characteristics, benefits and quality of their product as being "completely safe, all biodegradable, non-polluting, made to comply with federal regulations and made from the finest of active ingredients." The debtors also used numerous other misrepresentations and a plan of deceit in enticing the consumers to engage in a purchase of soap products from them. These included the flyer, demonstrations and other sales talk that were filled with false representations.

Section 59.1–204 allows any person who is damaged as a result of § 59.1–200 to bring an action to recover actual damages, or $100, whichever is greater. The section also allows for a recovery of reasonable attorney's fees and court costs. Further, § 59.1–206 provides that "if the court finds that a person has willfully engaged in an act or practice in violation of § 59.1–200, or has willfully violated the terms of any assurance of voluntary compliance, the Attorney General, the attorney for the Commonwealth, or the attorney for the county, city, or town may recover for the literary fund, upon petition to the court, a civil penalty of not more than $1,000 per violation." The section additionally provides that "[s]uch attorney may also recover, upon petition to the court, court costs, reasonable expenses incurred by the state or local agency in investigating and preparing the case not to exceed $200 per violation, and attorney's fees." Also, "[s]uch expenses and attorney's fees shall be paid into the general fund of the Commonwealth or of the county, city, or town which such attorney represented."

The debtors in the case at bar violated both the Virginia Prizes and Gifts Act and the Virginia Consumer Protection Act. The debtors violated § 59.1–416 of the Virginia Prizes and Gifts Act by obligating the consumers to sit through a lengthy sales presentation before giving the consumers their free gift. In addition, the debtors violated § 59.1–417 by failing to reveal to the consumers all material conditions attached to their receipt of the appliance that was represented as a free gift. The consumers were led to believe that the appli-

ance was a bonus when in fact, the consumers were purchasing the additional products and the additional products were being used as collateral to secure the promissory notes. The debtors also violated this section by failing to list on the worksheets the actual values of the appliances that were represented as being a free gift.

In addition, the debtors also violated several provisions of § 59.1–200 of the Virginia Consumer Protection Act through their numerous misrepresentations in connection with the sales presentation and sales contract they entered into with the consumers. The facts of the case is replete with false representations made by the debtors.

A violation of the Virginia Prizes and Gifts Act is a specific violation of the Virginia Consumer Protection Act and therefore, violators of the Virginia Prizes and Gifts Act are subject to the relief provisions of the Virginia Consumer Protection Act. Under the Virginia Consumer Protection Act, the Court is empowered to assess a civil penalty of not more than $1,000 for each willful violation of the act. Additionally, the Court may also award reasonable expenses incurred in investigating and preparing the case, not to exceed $200 per violation, and attorney's fees.

## CONCLUSION

Based on the evidence before the Court, the Court is of the opinion that the plaintiff in the present case has proven by a preponderance of the evidence each of the elements necessary to establish that the debtors committed fraudulent practices in the running of their business, Tri–Marketing Concepts. Therefore, the debtors are liable to the consumers who purchased their products. Accordingly, the Court finds that the debtor's indebtedness to the consumers is nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(A).

The Court finds for the plaintiff, the Commonwealth of Virginia. The debts are not dischargeable in bankruptcy. The Attorney–General shall prepare a proposed

order setting this forth and judgment for damages as well.